329 So.2d 583
**Thomas D. McDONALD**

v.

**STATE.**

**8 Div. 524.**

Court of Criminal Appeals of Alabama.

May 27, 1975.

Rehearing Denied June 30, 1975.

Watts, Salmon, Roberts, Manning & Noojin, Huntsville, for appellant.

William J. Baxley, Atty. Gen., William G. McKnight and William M. Bowen, Jr., Asst. Attys. Gen., for the State.

DeCARLO, Judge.

Thomas D. McDonald was convicted of bribery and sentenced to three years. All of the judges of the 23rd Judicial Circuit recused themselves. The Chief Justice, Howell T. Heflin, assigned the Hon. L. S. Moore, Supernumerary Circuit Judge to preside over this case.

Before trial, appellant filed a plea in abatement based upon fraud and other irregularities in making up the jury box

from which the grand jury returning the indictment was drawn. Appellant also filed a written waiver of his right to jury trial on the grounds of extensive pre-trial publicity, but did not file a motion for change of venue. Both the plea in abatement and the motion to waive a trial by jury were properly overruled by the court. *Shields v. State,* 52 Ala.App. 690, 296 So.2d 786.

On appeal, appellant also challenges the court's action in hearing the evidence on the plea in abatement without a jury. The record does not reflect an objection by defense counsel and failure to submit this matter to a jury was not prejudicial to appellant. *Racine v. State,* 291 Ala. 684, 286 So.2d 896.

Appellant was charged by a four-count indictment with violations of T. 14, § 64, Code of Alabama 1940, Recompiled 1958, in accepting a bribe or agreeing to accept a bribe. A plea in abatement and demurrer thereto were overruled.

After an election by the State, the case was submitted to the jury on count one which reads:

"Thomas D. McDonald, alias Tom McDonald, a judicial officer, to-wit: Judge of the Madison County Court, Huntsville, Madison County, Alabama, did in, to-wit: December, 1971, in or near the office of the said Thomas D. McDonald, alias Tom McDonald, in the Courthouse of Huntsville, Madison County, Alabama, unlawfully and corruptly accept or agree to accept a gift, gratuity, or other thing of value, or a promise to do an act beneficial to the said Thomas D. McDonald, alias Tom McDonald, to-wit: Sexual intercourse, the promise of sexual intercourse, or the promise of other sexual favors or relationship from one Myra Layton Braidfoot, alias Myra Braidfoot Layton, a woman, under an agreement or with an understanding that his act, opinion, decision or judgment would be given in a particular manner, or upon a particular side of a cause, question, or proceed-

ing, which by law was pending before him in his official capacity, to-wit: The cause, question or proceeding being a criminal prosecution of said Myra Layton Braidfoot, alias Myra Braidfoot Layton, wherein the said Myra Layton Braidfoot, alias Myra Braidfoot Layton, was charged with Grand Larceny under the laws of the State of Alabama, and said criminal prosecution being otherwise identified as the *State of Alabama vs. Paul Duane Braidfoot, Myra Layton Braidfoot,* Defendants, Case No. 97467, Madison County Court, Huntsville, Madison County, Alabama, and that the said Thomas D. McDonald, alias Tom McDonald, as Judge of the Madison County Court, Huntsville, Madison County, Alabama, would dismiss or cause to be dismissed, nol-pros or cause to be nol-prossed, reduce or cause to be reduced, continue or cause to be continued, or otherwise, dispose of or have disposed of, said criminal prosecution in a manner beneficial to the said Myra Layton Braidfoot, alias Myra Braidfoot Layton, all against the peace and dignity of the State of Alabama."

This count is based on T. 14, § 64, Code of Alabama, which provides:

"Any legislative, executive or judicial officer or any municipal officer, or any deputy officer, or any clerk, agent or employee of any such legislative, executive, judicial or municipal officer who corruptly accepts or agrees to accept any gift, gratuity, or other thing of value, or any promise to make any gift, or to do any act beneficial to such officer, under an agreement, or with an understanding that his act, vote, opinion, decision or judgment is to be given in any particular manner, or upon any particular side of any cause, question, or proceeding, which is pending or may be by law brought before him in his official capacity: Or that he is to make any particular appointment in his official capacity, shall, on conviction, be imprisoned

in the penitentiary for not less than two years or more than ten years."

At trial Myra Layton Braidfoot testified she had been arrested in Madison County on a charge of "conspiracy of larceny." Between November and December, 1971, she appeared in Judge Thomas D. Mc-Donald's court three times, and on each occasion, she saw appellant in his chambers.

The first time, she was told by the bailiff that the judge wanted to see her. While in the judge's chambers, she sat on a couch and appellant sat in a chair behind his desk. Although she couldn't remember the extent of their conversation, she did recall the judge commented about how attractive she was.

When she was called into the judge's chambers the second time, he again remarked how attractive she was. She did not recall anything else about their conversation.

Her testimony as to the third occasion was:

"Q. What happened the third time, please ma'am?

"A. Well, we were in his Chambers again, and as we were getting up to leave he asked me if I could meet him at Kings Inn at 10:00.

"THE COURT: Asked you what?

"A. If I could meet him at Kings Inn at 10:00.

"Q. The Defendant asked her if she could meet him at the Kings Inn at 10:00.

"THE COURT: All right. I'm just a little hard of hearing.

"Q. Did he touch you or anything that time, squeeze you?

"A. He put his arm around my waist.

"Q. This Defendant, Thomas Mc-Donald?

"A. Yes, sir.

"Q. And were you alone in his office?

"A. Yes, sir.

"Q. And what again did he say now, other than meeting him at the Kings Inn?

"A. He said if I met him at Kings Inn we could talk about the situation and maybe take care of it.

"Q. Of the case?

"A. Yes, sir.

"Q. All right. If you met him at Kings Inn at 10:00, what did you tell him?

"A. I told him that I would."

Only she and appellant were present on each of the three visits, and during this period of time, her case was being continued. Following the last visit, she reported the incident to her lawyer in Decatur, and the case was later transferred to another court.

Judge Thomas D. McDonald, Judge of the General Sessions Court of Madison County, since January 1, 1974, and prior to this time, Judge of the Madison County Court, testified in his own behalf. He recalled that on December 9th or 16th of 1971, about 9:30 A.M., he sent either his bailiff or clerk to summons Myra Braidfoot to his chambers. She was alone, and either he or the bailiff closed the door. He sat at his desk and she sat on the sofa or a chair. He informed Myra Braidfoot her attorney would be late. They discussed her charges, but he did not recall telling her she was attractive. He denied asking her to meet him at the Kings Inn, but stated he may have taken her arm and escorted her to the door.

He stated the morning docket had not been completed. Ordinarily court was recessed after the first call until 10:00 A.M., and sometimes preliminary hearings would continue into the afternoon.

## I

Appellant's demurrer to the indictment contained 84 grounds, and he insists the judge erred in overruling it. In its brief, the State grouped these grounds under four general arguments, and the court's action will be evaluated in this context.

■ 1. The indictment does not apprise the accued with reasonable certainty of the act or acts with which he is charged.

No code form exists in Alabama, for the offense denounced in T. 14, § 64, supra. The indictment charged the offense in the words of the statute, *Harris v. State,* 32 Ala.App. 519, 27 So.2d 794, and it sufficiently recited the essential elements of the offense of bribery. The requisite general description of the offense was apparent. *Caruthers v. State,* 74 Ala. 406.

Identification of the accusation was sufficient to enable the accused to prepare his defense and permit the court to pronounce a proper judgment on conviction. *Fitzgerald v. State,* 53 Ala.App. 663, 303 So.2d 162.

■ 2. The indictment charges "two separate offenses" in the alternative.

Alternative joinder of offenses is expressly provided for in T. 15, § 249, Code of Alabama.

■ Where a statute specifies several ways in which an offense may be committed, they may be charged in one indictment or count using conjunctions to connect them. *Arellanes v. United States,* 9 Cir., 302 F.2d 603.

■ 3. It does not specify the nature of the "gift, gratuity, or other thing of value" accepted by appellant.

The gift, gratuity, or other thing of value averred in the indictment was ". . . Sexual intercourse, the promise of sexual intercourse, or the promise of other sexual favors or relationship from one Myra Layton Braidfoot . . ."

12 Am.Jur.2d Bribery § 7, states this test for determining value:

"It seems that a bribe must involve something of value that is used to influence action or non-action. Value, though, is determined by the application of a subjective, rather than an objective, test, and the requirement of value is satisfied if the thing has sufficient value in the mind of the person concerned so that his actions are influenced."

In *Caruthers v. State,* supra, Judge Somerville wrote:

"The word 'thing' does not necessarily mean a substance. . . . [I]t includes an act, or action."

The Ohio court recognized in *Scott v. State,* 107 Ohio St. 475, 141 N.E. 19, that it is impossible to establish value which is universal. Further, the court stated: "The test of the value must necessarily be the desire of some person or persons, not necessarily of most persons or all persons, for the thing in question." In conclusion, the court held that sexual favors solicited in exchange for official action was a sufficient thing of value.

■ 4. The indictment did not specify the official duties of the accused sought to be corruptly influenced.

The official duties were generally stated in this manner:

". . . [T]hat his act, opinion, decision or judgment would be given in a particular manner, or upon a particular side of a cause, question, or proceeding, which by law was pending before him in his official capacity . . ."

and more specifically:

". . . [W]ould dismiss or cause to be dismissed, nol-pros or cause to be nol-prossed, reduce or cause to be reduced, continue or cause to be continued, or otherwise dispose of or have disposed of, said criminal prosecution

in a manner beneficial to the said Myra Layton Braidfoot . . ."

■ The law does not protect a corrupt judge because he exceeds his powers, and his actions are "colorable" only. *People v. Jackson*, 191 N.Y. 293, 84 N.E. 65; *Wells v. State*, 174 Tenn. 552, 129 S.W.2d 203; *Whitney v. United States*, 10 Cir., 99 F.2d 327.

■ The gravamen of the offense is the acceptance and solicitation of the bribe to influence his official conduct. *Sharp v. United States*, 8 Cir., 138 F. 878.

## II

To sustain its burden of proof, the State offered evidence of similar transactions to show intent, motive, design and scheme. This evidence involved four other females having matters coming before appellant's court and the attending facts relative to their transactions with appellants.

Appellant insists the trial court erred in allowing this evidence and urgently contends that the testimony of Cheryn Forsythe, Brenda Gwathney, Laura Blann, and one other whose anonymity was preserved, was palpably erroneous and prejudicial.

The facts as related by Cheryn Forsythe were:

In March, 1971, she came before Judge McDonald on a charge of issuing a worthless check to Tourway Inn. After a demand for preliminary hearing, the charge was amended on motion of the District Attorney, and she pleaded guilty. Upon payment of the fine and costs, the sentence was suspended for restitution. After restitution, the jail sentence was remitted.

On April 1, 1971, she was arrested on a fugitive warrant growing out of a probation violation in the State of Ohio. This case was continued from time to time on her own motion and prosecution was dismissed on May 27, 1971.

At the time she was arrested on the Tourway Inn check, Billy Eades, a city policeman, accompanied her to Judge McDonald's office. The officer asked the judge to help her because she was working with the police. At that time, the Tourway Inn check and the Ohio flight warrant cases were pending against her. After Officer Eades talked to Judge McDonald, she remained out of jail and continued to help the police.

In October, 1971, she was before appellant's court for issuing a worthless check to Southern Airlines. On advice of the bailiff, she went to the judge's chambers to discuss the case. The judge advised her to get a lawyer, and the warrant, being defective, was dismissed. Subsequently, she was re-arrested on a new warrant and went to see appellant in his chambers. Her testimony was:

"A. He asked me if I could meet him in his Chambers—I mean meet him. I asked why, he said he wanted to talk to me and that he could get it taken care of.

"Q. Get the case taken care of?

"A. Yes."

Either that day or the next, she met appellant at the parking lot of the Big Gun Store and followed him in her car to George Fann Realty. It was just after dark when they arrived and both went into the office. After talking for awhile, the judge mixed himself a few drinks but the witness did not have any. She testified that after having sexual intercourse with the judge on the couch, he told her to bring the money by in a few days to pay the check. Eventually she took the money to him and never went back to court on that case.

———

In October, 1972, she was arrested on nine worthless check cases and after going to the sheriff's office, three additional warrants were placed against her. Again, she went to the appellant's office. He

told her she could make a personal bond on those warrants and not to worry, that she wouldn't need a lawyer. She was directed to plead guilty and get the money to pay the checks. At this time, she was pregnant, and the judge put his arms around her back and buttocks and tried to kiss her.

After this meeting she went to court every Tuesday and when a check appeared on the docket, appellant asked if she had the money to make restitution. If she had it, it was paid, and if not, she was given two or three weeks to pay the check. Each time she would plead guilty, the sentence was suspended and after payment of court costs the sentence was remitted.

In March, 1973, she was arrested on other worthless check cases. It was about this time that newspaper publicity was released concerning Judge McDonald's handling of her cases.

After the arrest, she called the judge from jail, to see if she could make a cash bond. She was told a friend would do it, and that was all he could do for her.

In April, 1973, she testified before the Madison County Grand Jury and after two days of testimony, she related to the jury the circumstances involving her relationship with Judge McDonald.

Judge McDonald testified Cheryn Forsythe had three worthless check cases and a bigamy case pending in the Madison County Court. The warrants on the check charges were executed on October 2, 1972, and continuances were given from time to time. On her appearances in court on these cases, she was sentenced to thirty days. Subsequently, some police officers told him she was working as an informer on a series of robberies and they requested him to keep her out of jail. He agreed to cooperate and saw to it that she was not imprisoned. She received a thirty day sentence. It was suspended pending payment of fine, and later this sentence was suspended.

She had been to his office once on the Southern Airline case and again on a board and lodging case when accompanied by the police. He did not ask her to meet him at a parking lot, Governors Drive or at the Big Gun Store, and did not go to Fann Realty with her. When he was consulted on the worthless check warrants, he encouraged her to make restitution. He denied kissing or putting his arm around her at any time.

As to Brenda Gwathney, the evidence submitted was: In August, 1972, she went to Judge McDonald's court to answer a worthless check charge. She entered a plea of guilty and made restitution on that date. Not having enough money to pay the fine, appellant continued the case so she could get the money. The case was suspended for payment until September 5, 1972, and when she was unable to pay, she went to see Judge McDonald. While talking to him in his chambers, he asked where she lived and worked. As she got up to leave, appellant tried to kiss her and said he would give her another week or so.

The case was again continued at her request to October 10, 1972. At the October setting, she was late for her appearance in court and went to the judge's chambers again. She still didn't have the money to pay the fine and was upset because of the pending jail sentence. Judge McDonald sympathized and continued the case. As she was leaving, he put his arms around her and kissed her. The door to the judge's chambers was closed on each occasion. Her testimony about the last visit was:

"A. He asked if I could get out at night and I told him no, that I couldn't.

"Q. Did he say anything about your case?

"A. Just that he would give me all the time that I needed."

The last day she went back to court, she didn't see Judge McDonald, but was informed by one of the girls in the office that her case had been dropped.

Judge McDonald stated to his knowledge, Brenda Gwathney was not sentenced to jail on her first appearance in his court. The case was continued several times. One continuance was due to a death in her family.

Restitution had been made on the check, and the fine and costs were remitted. On the occasion she came to his chambers, he recalled putting his arm around her and escorting her to the door. He denied kissing her or asking her if she could get out at night.

The facts relating to Laura Blann as disclosed by the record were: In October of 1972, she appeared in Judge McDonald's court on a forgery charge.

At her first appearance, the preliminary hearing was "overruled", but she continued to return because of additional charges. Testimony regarding her first conversation with appellant was:

"Q. All right. Now, tell the Court and the jury, please, exactly what happened that time when you first had a conversation with the Judge.

"A. He asked me to come in his office, that he would like to talk about my cases with him. So, I went in his office alone, leaving my husband standing outside, and he said, 'Well, I'm concerned about all these forgery charges you have.' Said, 'How have you got them?' I explained to him that I had done it and that they had sent my checks up for fingerprints and that they was coming back just one at a time, they would arrest me as they came in.

. . . . . .

"Q. You told the Judge you were guilty, you had done it?

"A. Yes, sir. He told me not to ever plead guilty.

"Q. The Judge told you what then?

"A. He told me not to worry about it and not to plead guilty, that he would talk for me and he would get everything squared away.

. . . . . .

"A. He said, 'Don't plead guilty to anything, regardless of what it is, because you always have a chance of beating it in Court.'

"Q. The Judge told you that?

"A. Yes, sir.

"Q. Before he said that, had he said anything to you—had he given you any compliments or anything like that, or did he just get right into it?

"A. Yes, he told me I had beautiful eyes.

"Q. Go ahead. What, if anything, happened?

"A. Then he told me not to worry about the bigamy charge, that the State wouldn't prosecute a woman on bigamy anyway.

. . . . . .

"Q. Did he touch you in any way?

"A. Yes. He put his hands on me.

"Q. Where were you seated?

"A. I was sitting on his sofa in his office.

"Q. Where was he?

"A. He was sitting besides me, when I got up to leave he put his arm around me and he tried to kiss me, and I turned my head and he did kiss me on my cheek.

"Q. He tried to kiss you on the mouth?

"A. Yes.

"Q. Where all did he touch you? Just tell the Court and jury.

"A. He touched me on my breast and he rubbed my leg.

. . . . . .

"A. He asked me did my husband follow me around and was there any possible way I could meet him, and and then he said, 'Well, we better go back in the Courtroom. The recess is over.'

"Q. You didn't give him an answer at that time?

"A. No.

"Q. Did he ask you to call him?

"A. Yes, he told me I could call him any time I needed him, any time that I was arrested and needed a bond dropped, or either—any of my friends that needed any help in getting their bond cut down, he would help."

The next conversation she had with appellant was when she was arrested on forgery and "pretense" charges and placed in the Madison County Jail. She telephoned the judge to continue her preliminary hearing. He told her the case would be set up, but she should call him when she got home.

After a couple of days, she phoned the judge and was asked to come to his office that afternoon. He explained one had to be careful talking over the telephone. Upon arrival at his office, the judge locked the door and asked if she would like a drink. When she refused, he said he was a "scotch man" and gave her a bottle of bourbon. He again put his hands on her and tried to kiss her. She was asked to meet him at the Tourway Inn and was told he would give her a room key. She responded that she had a dental appointment and couldn't meet him.

On the night of April 27, 1973, she was in the Madison County Jail with Cheryn Forsythe, but denied Cheryn made any suggestion that she, Laura Blann, could help herself by testifying against the judge. She also denied having been shown any map of the judge's office.

Appellant testified he did not know Laura Blann until her case came before his court but remembered having one conversation with her in his chambers.

She approached him at the door of his office and asked to speak to him. It was just before 10:00 A.M., and to his knowledge, he did not lock the door. He sat at his desk and she sat on the couch or in a chair.

A bigamy charge was pending against her, and he advised her to have a lawyer; that she was presumed to be innocent, and if so, should not plead guilty. Nothing was mentioned about her calling him, and he did not recall any occasion when he offered her a drink. He did not give her any whiskey and did not ask her to meet him at the Tourway Inn.

No offer of a key to Tourway Inn or to help her friends was made, nor did he rub her leg or kiss her.

As to the anonymous witness, the testimony was:

Around March, 1971, an auto theft charge against her brother was pending in appellant's court. She went to the judge to ask if a bond could be set and was told it would cost a hundred dollars for his release.

After borrowing the money, the bond was made and appellant arranged for her brother to be brought down to the courtroom. While they were waiting for her brother, the following occurred:

"A. While they were bringing my brother down my mother was sitting out in the lobby, and the Judge said that he would like to meet me

some other place and talk to me about my brother.

"Q. Your mother didn't hear this did she?

"A. No.

. . . . . .

"Q. And so the Judge said what now?

"A. He said that he would like to meet me some other place and talk to me about my brother's case.

"Q. What, if anything did you say?

"A. I said okay.

"Q. What, if anything did he do then or say?

"A. He said that I would meet him at Fann Realty at 7:00.

. . . . . .

"Q. No. Did you go with the Judge or did you drive your own automobile or what?

"A. I drove my own automobile.

"Q. Did you know where to go?

"A. No, I followed the Judge.

"Q. Where did you meet up with the Judge?

"A. Our here in front of the Courthouse.

"Q. And you followed him?

"A. Yes, I did.

"Q. And when you got to Fann Realty, did you go inside?

"A. Yes, I did.

"Q. Did you go in together or how?

"A. Yes, I think he was waiting in the car when I pulled in.

"Q. What, if anything, happened then? Go ahead and tell the jury and Court what, if anything happened.

"A. I went inside and I thought that I was going to talk to the Judge about my brother.

"MR. MANNING: We object to what she thought.

"THE COURT: You object to what?

"MR. MANNING: I'm objecting to a mental operation. She testified to what she thought.

"A. No, I'm testifying to what I thought.

. . . . . .

"Q. Just tell what you said, what he said what you did and what he did. Now, what, if anything, happened after you got inside, what did the Judge say or do?

"A. I went inside with the Judge. I was sitting there, I was ready to talk to him about my brother's case because I knew that he was not guilty of taking the car. I did not go there—

. . . . . .

"Q. Did he get you a drink before that or did y'all have a drink?

"A. No, I didn't.
"Q. He fixed himself one?

"A. Yes.
"Q. After he fixed himself a drink, what did he do?

"A. He asked me to take my clothes off.
"Q. Did y'all have sexual relations there at the time?

"A. Yes.

"Q. After he finished, what, if anything, did he say to you? Did he ask you to call him?

"A. Yes, he did."

She next saw the judge in reference to a speeding ticket and asked that payment be postponed until she could get the money. Later she received a letter indicating she would be in contempt if she did not come

to court. When she saw the judge in his chambers, he told her the case had been continued but the letter was his only way of getting to see her. While they were in his chambers alone, he walked up behind, reached under her arms and started feeling of her breasts. She asked him "to let her go" and she left. He did tell her he would continue her case again.

Later in 1973, she again met the judge at Fann Realty concerning a peace bond against her husband. She had known appellant for about ten years and had seen him a few times in the clubs where she had worked as a barmaid.

Judge McDonald testified this witness would sometimes stop by his office on her way to the Registrar's office. In March, 1973, she came to see him in his office regarding a criminal charge pending against her brother. She wanted to get him out of jail and appellant advised her that a hundred dollar bond would have to be made. A cash bond was posted and her brother was released.

He denied asking her to meet him at Fann Realty or any other place. In February, 1973, she wanted a peace bond, and in March, telephoned him at home about another peace bond.

He told her to meet him at the courthouse basement. Arriving about 6:15 P.M., he said they would have to talk at the jail and she asked if they could talk elsewhere. Ultimately, they drove to a large parking lot. He sat in her car while they discussed the peace bond. After the conversation they each left in separate cars.

On the way home he stopped and greeted a friend at Fann Realty. Subsequently, the above mentioned witness walked in and after a short while the three left. He talked with her a minute in the parking lot concerning a speeding ticket.

He did not ask her to remove her clothes, and did not have sexual relations with her. At no time afterwards did he ever see her at the Fann Realty office.

He denied ever having a key to the back door of Fann Realty. The only time he had keys to the front door was when he hung pictures in the office, and these were left in the door when he finished.

Numerous grounds have been urged upon this court for a reversal of the judgment and although each and every one was considered separately and severally, only the pertinent ones will be reviewed here. In that regard, we believe the principal question necessary for rendering a decision in this matter involves the admission of "similar transactions" to show intent, motive, design and scheme.

It is a well recognized rule that in a prosecution for a particular offense, proof tending to show that accused is guilty of committing other crimes at other times is inadmissible, even though they are similar to the one charged in the indictment. *Gassenheimer v. State,* 52 Ala. 313.

The opinions in *Fall v. United States,* 60 App.D.C. 124, 49 F.2d 506; *White v. State,* 43 Ga.App. 748, 159 S.E. 897; *Scott v. State,* supra, and *Roden v. State,* 5 Ala.App. 247, 59 So. 751, sufficiently cover the rule governing admission of testimony about similar transactions of the defendant in bribery cases.

█ It is well to note however, that although the general rule excludes evidence of similar offenses for the purpose of showing bad character of the accused, exceptions are recognized if relevant for any purpose other than to show a mere propensity by the defendant to commit the crime charged. *Gassenheimer v. State,* supra; *Dennison v. State,* 17 Ala.App. 674, 88 So. 211.

█ In our determination of this issue involving the admission of "similar transactions," we assessed the testimony in the light of certain limitations outlined by defense counsel.

First, we found that a connection and pattern existed between the similar transactions and the offense charged. This was

indicated by the following facts from the testimony of the four witnesses:

1. All were women defendants or were interested in matters pending before the judge.

2. Each one went to the judge's chambers.

3. After each entered, the door was closed.

4. Each one was alone with the judge in his chambers.

5. Judge offered each aid or help in matters pending before him.

6. The judge hugged, kissed or touched each.

7. All were asked to meet the judge.

Second, appellant's transactions with the respective witnesses were not too remote in time; *United States v. Cochran,* 5 Cir., 499 F.2d 380, and occurred within these intervals:

| | |
|---|---|
| Braidfoot | November-December, 1971. |
| Forsythe | October, 1971-October, 1972. |
| Gwathney | September-October, 1972. |
| Blann | December, 1972-January, 1973. |
| Anonymous | March, 1971- March, 1973. |

Third, evidence of the similar transactions was admissible even though the proof shown was not sufficient to prove the similar offenses beyond a reasonable doubt. *Scott v. State,* supra.

Fourth, the general rule excluding evidence of similar transactions does not apply when it is material to the inquiry to show the intent with which the act charged was committed. *Roden v. State,* supra.

After admission of this evidence, in order to insure that no prejudice accrued to appellant, the trial judge admonished the jury as to the purpose of the evidence and at the close of the trial, again instructed the jury in this manner:

"Now, the State has made an effort to show by that evidence that the Judge has committed some other similar offenses, that is, similar to the ones [sic] charged in the Indictment, and the State, contends that he did commit other similar offenses. Now, once again, I'm not saying whether that contention on the part of the State is true or false, but it does present an issue, it's for the jury to say whether it's true or false. At the conclusion of that kind of evidence I limited that evidence, as you remember, to your consideration of the question of the intent that the Judge may or may not have had in the case that we are trying, and to the scheme or plan or action that he may have had in his dealing with this Braidfoot woman named in the Indictment.

. . . . . .

"Now, we are not trying him for these other offenses, it's merely evidence, and that evidence is to be limited in your consideration of the case that we are trying, as to the question of intent, scheme or plan."

Based on the foregoing, our judgment is the court's action in admitting the testimony of similar transactions showing intent, motive, design and scheme was proper.

### III

It is strongly insisted by appellant that the evidence was insufficient to authorize a conviction.

To constitute an offer to accept a bribe, the thing solicited must be valuable and may be some act. *Caruthers v. State,* supra.

The Alabama statute condemns an offer to accept a bribe by promise of a "thing of value", and a conviction may be had on proof that an offer to accept by an accused was made in exchange for his official partiality in matters pending before him.

Although the evidence before the jury was in dispute, it could be inferred from this statement in Braidfoot's testimony, "if I met him at the Kings Inn we could talk about the situation and maybe take care of

# 544

it," appellant was asking for a "thing of value" or an "act beneficial to" himself.

 The word "value" is not limited to desirable things generally received in bribery cases. The test of value is the desire of a person for the thing in question. *Scott v. State,* supra.

Authorities have shown that relevant, similar transactions as those committed by appellant are admissible. *Fall v. United States,* supra; *White v. State,* supra; *Scott v. State,* supra, and *Roden v. State,* supra.

Appellant argues the "pattern" evidence was inadmissible as nothing of value was solicited of Braidfoot or the others. A similarity between the Braidfoot matter and the pattern testimony is apparent. It could reasonably be inferred that appellant's intent, motive, design and scheme in all of the transactions were the same and it was his intent to exchange his high judicial functions for what he personally desired.

 Where there is legal evidence, as in this case, from which the jury can by fair inference find the accused guilty, this court has no right to disturb the verdict. *Haggler v. State,* 49 Ala.App. 259, 270 So.2d 690.

Affirmed.

All the Judges concur.

## ON REHEARING

Application overruled.

CATES, P. J., and TYSON, HARRIS and DeCARLO, JJ., concur.

BOOKOUT, Judge (dissenting):

The indictment charges that appellant, ". . . did . . . unlawfully and corruptly accept or agree to accept . . . a promise to do an act beneficial to the said Thomas D. McDonald, . . ., to-wit: Sexual intercourse, the promise of sexual intercourse . . . from one . . . Myra Braidfoot Layton, a woman, under an agreement or with an understanding that his act, opinion, decision or judgment would be given in a particular manner, or upon a particular side of a cause, . . . ., being a criminal prosecution of said Myra Layton Braidfoot, . . ., charged with Grand Larceny under the laws of the State of Alabama," and that he "would dismiss or cause to be dismissed, nol-pros or cause to be nol-prossed, reduce or cause to be reduced, continue to cause to be continued, or otherwise dispose of or have disposed of, said criminal prosecution in a manner beneficial to said Myra Layton Braidfoot. . . ."

Mrs. Braidfoot testified that on her third visit to the Judge's chambers, "he said if I met him at the King's Inn we *could talk* about the *situation* and *maybe* take care of it." She told him she would meet him there. Appellant made no promise or agreement to do anything specifically about the case. He only agreed "to talk about the situation and *maybe* take care of it." (Emphasis supplied).

The appellant's conduct with other women certainly shows pattern, motive, or intent, however, intent alone is insufficient to support the positive averments spelled out in the indictment. The above conversation lacked specificity of action by the appellant as charged in the indictment. On reviewing the evidence, I am unable to find an actual promise or agreement that appellant would dismiss or nol-pros Mrs. Braidfoot's case in exchange for her favors. He suggested meeting and talking, and although we may believe from his pattern of conduct he would make an illegal proposition, nevertheless, we do not know for he never got to that point.

After considering the application for rehearing, I have sufficient doubt that I now believe the seriousness of the case and charges involved deserve our review on rehearing.