**STATE of Iowa, Appellee,**

v.

**Wayne A. McDANIEL, Appellant.**

**No. 59505.**

Supreme Court of Iowa.

May 17, 1978.

 

Cahill, Johnston, Poula & Goetz, Iowa City, for appellant.

Richard C. Turner, Atty. Gen., J. Susan Carney and Harold A. Young, Asst. Attys. Gen., and David W. Newell, County Atty., for appellee.

McCORMICK, Justice.

Defendant appeals his convictions and sentences on three counts of delivery of a controlled substance in violation of § 204.-401(1), The Code. The substances were marijuana, pentobarbital and phenobarbital. His trial was bifurcated under procedures delineated in *State v. Monroe,* 236 N.W.2d 24 (Iowa 1975). He contends that the trial court, Werling, J., erred in several respects in the first proceeding and that the accommodation trial court, Grant J., erred in the second. We find merit only in his contention that the accommodation trial court erred in overruling his motion for directed verdict on the accommodation issue. As a result we affirm in part and reverse in part, remanding for resentencing of defendant as an accommodation offender.

Defendant contends the trial court in the first proceeding erred (1) in refusing to sequester the jury panel for voir dire, (2) in admitting evidence of other crimes, (3) in admitting controlled substances for demonstrative purposes, and (4) in overruling his motion for directed verdict. In addition, he asserts (5) he should have a new trial because of cumulative errors.

He also contends (6) the accommodation trial court erred in several respects. However, we address only one of those contentions because we find his claim that the court erred in overruling his motion for directed verdict on the accommodation issue is determinative as to that proceeding.

We first summarize the evidence in its light most favorable to the State. Defendant was chief of police in Muscatine and

Barbara Edington was a 38-year-old divorcee who was a resident of that city.

Defendant and Edington had been acquainted for 15 or 16 years. Approximately three or four years before the events in the present case Edington received a telephone call from defendant telling her she could come and get a television set of hers which the police had been holding as evidence in connection with a charge against another individual. Subsequently defendant and Edington intensified their relationship. They talked on the telephone and defendant visited her, although not in her home. He sometimes brought vodka to her and, on occasion, gave her small amounts of money. In about October 1973 defendant started bringing marijuana to Edington. He and Edington became intimate at approximately the same time. They met about twice a month. He brought marijuana to her and they had sexual relations on each occasion.

Edington testified she wanted the marijuana to give to friends, some of whom lived in her house. She asked for other drugs for the same purpose.

Defendant obtained the controlled substances from contraband which the police had confiscated.

An informer told a deputy sheriff that defendant was furnishing drugs to Edington. The sheriff enlisted the help of state law enforcement officials. Officers treated phenobarbital and barbiturate tablets and marijuana with a material which became luminous under a certain kind of light. They "planted" the items in a telephone booth and anonymously called the police and told them a drug pickup would occur at the booth.

The police set up surveillance at the booth, but when a pickup failed to occur they seized the items. In due course the items came into defendant's hands.

On some prior occasions defendant had delivered marijuana to a shed behind Edington's house for her to pick up. This time on the morning of March 8, 1975, after some previous calls, defendant telephoned Edington he would leave the "stuff" in her shed.

The informer alerted the officers that this delivery would be made, and the officers set up surveillance near the shed. That morning defendant arrived with a brown bag and left it in the shed. An officer photographed defendant in the process. The officers then waited for the pickup.

During this period Edington was living with a 19-year-old man named Jerry Brown. On the morning defendant made the delivery in question, Edington was still in her night clothes, and Brown therefore went out to the shed to get the drugs. He entered the shed, but about then two of the officers got out of their car to intercept him. Brown saw them and came out of the shed without the brown bag as a matter of caution. The officers found the bag in the shed. Edington and Brown gave statements concerning their respective parts in these events.

The bag contained pentobarbital and phenobarbital tablets and marijuana. Some of the tablets were marked with the luminous material.

A grand jury indicted defendant on three counts of delivering controlled substances, and a trial jury found him guilty of all counts. A second trial jury found the delivery was not an accommodation. Defendant was sentenced, and this appeal followed.

I. *Sequestration of voir dire.* In the first proceeding defendant moved the court to conduct the voir dire examination of each prospective juror apart from the other jurors. The court overruled the motion and defendant claims error, citing A.B.A. Standard Relating to Fair Trial & Free Press § 3.4(a) (1968).

The A.B.A. standard advocated by defendant provides for individual voir dire of prospective jurors in situations where jurors have been exposed to potentially prejudicial material. The trial court recognized

its discretion to conduct voir dire in that manner here but declined to do so, believing a fair jury could be obtained through regular procedures.

The record does not provide a basis for finding the court abused its discretion. See *State v. Elmore*, 201 N.W.2d 443, 445 (Iowa 1972). In addition it does not contain any basis for finding defendant was prejudiced by the procedures used because it does not show he was harmed.

We find no merit in this assignment.

II. *Evidence of prior relationship.* Over defendant's objection, the court permitted the State in the first proceeding to introduce evidence of the prior sexual relationship between defendant and Edington and of defendant's prior deliveries of drugs to her. Defendant argues the court violated the rule that evidence of other crimes is ordinarily irrelevant and inadmissible. *State v. Wright,* 191 N.W.2d 638 (Iowa 1971).

Defendant also argues Edington's testimony about these matters was not credible. The weight and credibility to be attached to Edington's testimony, however, was a factual issue for the jury and not a legal issue for the court. *State v. Newman,* 257 N.W.2d 29, 31 (Iowa 1977). Defendant's argument to the contrary is untenable.

As to his principal argument, we have recognized the general principle that evidence which shows commission of crimes other than the one with which a defendant is charged is inadmissible. We have also recognized exceptions permitting such evidence when it tends to prove (1) motive, (2) intent, (3) absence of mistake or accident, (4) a common scheme or system of criminal activity embracing the commission of two or more crimes so related that proof of one tends to prove the other, or (5) identity of the person charged with commission of the crime. *State v. Wright,* 191 N.W.2d 638, 639–640 (Iowa 1971).

The basic standard by which other crimes evidence is tested is relevancy. *State v. Jeffs,* 246 N.W.2d 913, 915 (Iowa 1976). However, even when such evidence has some relevancy the trial court must exercise discretion to determine whether the probative value of the evidence is substantially outweighed by the danger of unfair prejudice. *State v. Johnson,* 224 N.W.2d 617, 621 (Iowa 1974).

The State's evidence of defendant's prior relationship and transactions with Edington was clearly admissible under this standard. The State's theory was that defendant's delivery of the drugs to the shed was in reality a delivery to Edington. It had to prove the delivery and that defendant had knowledge the paper bag contained drugs. But it could not show a delivery personally to Edington, and defendant denied even taking the bag to the shed.

Therefore it became vital to the State's case to show defendant's visit to the shed was part of a regular scheme or system of criminal activity in which he furnished Edington with drugs. This evidence enabled it to do so. It also helped establish defendant's knowledge that the bag contained drugs.

The evidence of the parties' prior sexual intimacy tended to negate the possibility of mistake or accident. It also was so closely related in time and place to the furnishing of drugs as to be admissible as an inseparable part of those transactions. See *State v. Lyons,* 210 N.W.2d 543, 546 (Iowa 1973).

The trial court did not abuse its discretion in admitting this evidence.

III. *Demonstrative evidence.* Defendant put in the bag and placed in the shed only part of the marked tablets. The State offered evidence of the marking of all of them by the officers, and the trial court permitted the State to introduce the marked pills which were in the bag and also those which defendant did not place in the bag. Defendant contends this was error.

We have examined the evidence and do not find confusion resulted as defendant

contends. The State did not try to deceive anyone. It showed the whole picture from beginning to end: the marking of the entire lot, the portion which defendant delivered, and the portion which he did not deliver.

The trial court acted within its discretion in admitting this demonstrative evidence. *State v. Badgett,* 167 N.W.2d 680, 686 (Iowa 1969); *State v. Kittelson,* 164 N.W.2d 157, 168 (Iowa 1969); McCormick on Evidence, § 212 at 526, 528 (Second Ed.1972).

IV. *Directed verdict in the first proceeding.* Defendant argues the trial court should have sustained his motion for directed verdict at the original proceeding based on insufficiency of proof of delivery and of knowledge by defendant that the contents of the bag were controlled substances.

In passing upon such a motion a court views the evidence in the most favorable light to the State and accepts reasonable inferences from the evidence which support the verdict. If substantial evidence supports the charge, the court submits the case to the jury for determination. *State v. Beyer,* 258 N.W.2d 353, 356 (Iowa 1977).

The State generated a strong jury case here; the question is not even close. The testimony of the officers who arranged the pickup at the telephone booth, of the surveillance officers at the shed, of Edington, and of Brown required the trial court to overrule the motion to direct.

V. *Cumulative errors.* Defendant contends he should have a new trial because of the cumulative effect of the errors he has assigned. As to the first proceeding we have found no merit in any of his assignments of error. Therefore they provide no basis for upsetting that part of the case. We reverse as to the second proceeding on a separate ground, making this contention moot as to it.

In this assignment defendant does, however, present a new argument in relation to the first proceeding. He contends his original trial counsel was inadequate in failing to use a discovery deposition of Stephen Hensen, one of the officers who maintained surveillance at the shed. In the deposition Hensen testified he saw Jerry Brown go into the shed and come out, and that just before Brown came out he appeared to step back, stop, and drop something.

Brown's testimony was that he went to the shed to get the drugs, saw two officers approaching, and came out of the shed empty-handed.

The State's theory was that defendant placed the drugs in the shed as its eyewitnesses testified, and that Brown at Edington's bidding came to get the drugs, saw the officers, and for that reason did not bring out the drugs.

Defense counsel at the original trial could have used Hensen's discovery deposition to try to get Hensen to testify at trial as he did on discovery that Brown appeared to drop something. But the evidence did not show Brown took anything into the shed; the inference appears to be more likely that Brown found the bag defendant had brought, then saw the officers, and thereupon dropped the bag. If defense counsel went over these matters with Hensen at trial, he stood a good chance of emphasizing the State's theory of what happened. This is the kind of decision which involves tactics, not inadequacy of counsel. We cannot find original counsel was inadequate on this ground. See *Bizzett v. Brewer,* 262 N.W.2d 273 (Iowa 1978).

Therefore we affirm the trial court as to the first proceeding in this bifurcated trial.

VI. *Directed verdict in the accommodation proceeding.* Defendant alleges the accommodation trial court erred in overruling his motion for directed verdict in the accommodation proceeding. We find merit in this assignment.

The burden was on the State to introduce substantial evidence from which the jury

could find beyond a reasonable doubt defendant did not deliver the drugs as an accommodation to Edington.

The events here occurred before the amendment to § 204.410, The Code, on July 1, 1976, Acts 66 G.A. Ch. 1245, ch. 4 § 231, which narrowed nonaccommodation to transactions entered "for the purpose of making a profit". See *State v. Didley,* 264 N.W.2d 732 (Iowa 1978). Therefore the accommodation definition in *State v. McNabb,* 241 N.W.2d 32, 35 (Iowa 1976), applies. See *State v. Stidolph,* 263 N.W.2d 737, 739 (Iowa 1978). In *McNabb* we said the words "only as an accommodation to another individual", as used in former § 204.410, meant "to furnish, as a favor to the recipient, something the recipient desires." 241 N.W.2d at 35. Under that definition it was necessary for the State to prove the drugs were not delivered as a "favor" to Edington.

The State's theory was that defendant delivered the drugs as a "quid pro quo" for sexual intercourse and not as a "favor" under *McNabb.* In *State v. Knutson,* 220 N.W.2d 575 (Iowa 1974), we recognized that sexual relations may constitute consideration in a pecuniary sense. This principle is also integral to the concept of prostitution. See *State v. Price,* 237 N.W.2d 813 (Iowa), appeal dismissed, 426 U.S. 916, 96 S.Ct. 2619, 49 L.Ed.2d 370 (1976). Thus, in effect, it was necessary for the State to show the drug deliveries were a price paid for sex rather than a gratuity.

The evidence on which the State relied in an effort to carry its burden on the accommodation issue consisted of the following testimony of Edington:

Q. As of March 8, 1975, or at some point in time prior to that, had you established an intimate relationship with Mr. McDaniel? * * *

The Witness: Yes.

Q. When did that begin? *. * *

The Witness: It was in October, probably, of the first year that I lived there.

Q. What year would that be? A. 1973. * * *

Q. Over the course of the year, we'll say leading up to March 8th of last year, on how frequent a basis would you see Mr. McDaniel? * * *

The Witness: Approximately every two weeks. Not always, but usually on the night that they had council meetings. * * *

Q. All right. Did you have any arrangement with the defendant, Mr. McDaniel, to pay him for the materials that came on the morning of March 8th? * * *

The Witness: No. * * *

Q. Did you intend to pay him at any time on or after March 8 for those materials? A. No. * * *

Q. All right. During the month of January of 1975, would you have seen the defendant? A. Yes.

Q. On how many occasions? A. Once or twice, because it was every—every month, I seen him; usually once a month at least, if not twice * * *.

Q. During those two preceding months, January and February of 1975, did you have any sexual contact with the defendant?

The Witness: Yes * * *.

Q. On those occasions, did you give anything to the defendant, any money, any physical property, goods? A. No.

Q. Did you receive anything from him? A. Yes.

Q. What did you receive? A. Marijuana * * *.

Q. Did you receive [marijuana] on every occasion that you saw him? A. Yes * * *.

Q. Well, how many times did you talk about it? A. Well, when he would call on the phone, marijuana and sex was all that was usually even really talked about * * *.

Q. You said that in connection with the marijuana, you also discussed sex with the defendant? A. Yes * * *.

Q. Mrs. Edington, can you tell us the date or the approximate date that you first discussed marijuana with the defendant? A. In October of 1973, I couldn't tell you the exact date.

Q. And when did you first establish the intimate relationship with the defendant. A. About that time.

* * * * * *

Q. (Cross-examination) And your relationship with Jack has always been a friendly, compatible sort of relationship? A. Yes.

Q. You didn't expect anything from him, and he didn't really expect anything from you, in terms of friendship, did he? A. Not until the last—Since October of 1973. It just kind of got to be a thing * * *.

Q. Okay. The next time you testified was at the preliminary hearing. Now, you testified that when you began meeting with Chief McDaniel, you always met him in the car, is that right? A. Yes.

Q. And that's when the sexual relations began? A. Yes * * *.

Q. But the times are simultaneous, when you talk about getting in the car with Officer McDaniel, you are also talking about that as being the point in time in which sex began too, aren't you? A. Yes.

Q. And you are also now stating that that's when the marijuana was begun to be given you, is that correct? A. Yes.

Q. And that all began in October of 1973? A. Yes * * *.

Q. —but your statement now is that having met with him twice a month, you had sex with him two or three times a month, and I would like to know how you did that? A. (No response.)

Q. (Redirect Examination) Well, Mrs. Edington, let me give you an opportunity to answer that question; during the months of January and February of 1975, how often did you see Mr. McDaniel? A. About two—not any more than two times a month.

Q. All right, how often did you have sex with him during that period? A. Every time.

We think the evidence shows, at best, an exchange of favors between willing paramours.

■ Edington did not testify the parties had an agreement to exchange sex for drugs. If such an agreement existed it must be implied from circumstantial evidence. For circumstantial evidence to be sufficient for jury consideration in a criminal case the jury must be able to find it inconsistent with any rational hypothesis to the contrary. *State v. Barnes*, 204 N.W.2d 827, 828–829 (Iowa 1972). Tested by that standard the evidence was insufficient here.

Even though Edington was assured immunity, her testimony did not constitute substantial evidence from which the jury could find beyond a reasonable doubt her participation in sexual relations with defendant was conditioned upon his delivering drugs to her. In fact in the context of the entire record, her testimony would support only a contrary inference. In addition to the testimony on which the State relies she testified defendant was a "friend" and "lover". On redirect examination she acknowledged testifying at preliminary hearing that she did not know why defendant was giving her marijuana. She had also testified, "I have never figured it out to this day; he just asked me if I had ever tried it, and I told him it didn't do nothing for me—." She said she wanted it to give to friends as a way of gaining their approval.

■ We do not believe the legislature intended the furnishing of drugs to a paramour to be legally equivalent to selling them for profit or to induce addiction. Instead, this case presents a plain situation of accommodation. The fact the jury could find defendant and Edington were involved in an exchange of favors is insufficient to permit a finding that the drug deliveries were something more than furnishing, "as a favor to the recipient, something the recipi-

ent desires". See *State v. McNabb,* supra, 241 N.W.2d at 35.

We reverse on the accommodation issue and remand for resentencing of defendant as an accommodation offender under Code § 204.410.

AFFIRMED IN PART; REVERSED IN PART.

MASON, RAWLINGS, REYNOLDSON and HARRIS, JJ. concur.

MOORE, C. J., and UHLENHOPP, Le-GRAND and REES, JJ., dissent.

UHLENHOPP, Justice (dissenting in part).

I think the jury could reasonably infer defendant delivered drugs to Edington to have sexual intercourse with her rather than merely to accommodate her. See *State v. Knutson,* 220 N.W.2d 575 (Iowa); *McDonald v. State,* 57 Ala.App. 529, 329 So.2d 583, cert. den. 429 U.S. 834, 97 S.Ct. 99, 50 L.Ed.2d 99.

The State was not required to satisfy the *court* beyond a reasonable doubt. On this record we as a court might or might not have a reasonable doubt as to defendant's purpose, if we reviewed the issue de novo. All the State had to do was introduce evidence of facts and circumstances from which a *jury* could reasonably infer that defendant did not deliver drugs to Edington to accommodate her. In determining whether a jury could so infer, we view the evidence in the light most favorable to the State. We stated in *State v. Overstreet,* 243 N.W.2d 880, 884 (Iowa):

> It is equally well settled that on defendant's appeal from criminal conviction based on jury verdict challenging sufficiency of evidence to sustain the verdict, this court views the evidence in the light most favorable to the State and accepts as established all reasonable inferences tending to support the jury's action. It is necessary to consider only the supporting evidence whether contradicted or not. It

is for the fact finder, not us, to resolve questions of fact and determine the credibility of witnesses.

Furthermore, the State did not have to prove an intent by defendant to make a profit or to induce dependency or habituation, or an intent by Edington to pay defendant any money, physical property, or goods. We said in *State v. McNabb,* 241 N.W.2d 32, 34–35 (Iowa):

> The statute lists neither two nor three elements for accommodation status. Rather it first announces a separate, lesser punishment where the offense was committed as an accommodation to another. Thereafter the legislature contrasts two of the possible examples where accommodation clearly does not exist.
>
> The words " * * * only as an accommodation to another individual * * " as used in this section mean to furnish, as a favor to the recipient, something the recipient desires.
>
> The facts in the instant case plainly exclude defendant from this definition. The furnishing of the pills was motivated by defendant's desire to recoup his money; it was not done as a favor to the recipient. Defendant was not an accommodation deliverer. . . .
>
> It was not necessary under these facts to show defendant sold the pills for a profit or that he sold them for the purpose of making another person dependent upon them. In either event such a showing would have been in itself sufficient to establish defendant was not an accommodation deliverer. But under the statute it was not necessary to make such a showing where the facts otherwise establish defendant did not fall within the definition.

See also *State v. Stidolph,* 263 N.W.2d 737 (Iowa).

Some of the testimony at the accommodation trial follows. Regarding the drugs in the bag defendant placed in the shed, Officer Timko testified:

> Q. All right. Can you tell us the quantity or approximate quantity of mar-

ijuana? A. Yes, I believe it would have been twenty-three grams. . . .

Q. And as to the barbiturates, do you have a count of the various barbiturates found? A. I do.

Q. Would you tell us what they were? A. There was approximately 10½ phenobarbital tablets; there were two pentobarbital tablets, also a barbiturate; there was also two amobarbitals; and approximately 56 phendimetrazine, which was at that time a Schedule III controlled substance.

As to the bearing the quantity of drugs has on the accommodation issue, see *State v. Metcalf,* 260 N.W.2d 857 (Iowa).

Edington testified that she had been married and divorced twice, lived with one Jerry Brown, and had known defendant about 23 years. She testified further in part (I have added the italics):

Q. As of March 8, 1975, or at some point in time prior to that, had you established an intimate relationship with Mr. McDaniel? . . .

The Witness: Yes.

Q. When did that begin? . . .

The Witness: It was in October, probably, of the first year that I lived there.

Q. What year would that be? A. 1973. . . .

Q. Over the course of the year, we'll say leading up to March 8th of last year, on how frequent a basis would you see Mr. McDaniel? . . .

The Witness: Approximately every two weeks. Not always, but usually on the night that they had council meetings.

. . .

Q. All right. Did you have any arrangement with the defendant, Mr. McDaniel, to pay him for the materials that came on the morning of March 8th

. . .

The Witness: No. . . .

Q. Did you intend to pay him at any time on or after March 8 for those materials? A. No.

Also:

Q. Do you recall when you would have first discussed the materials which

were delivered on March 8th with the defendant, when you would have had the first conversation relating to those materials? A. It was early on the afternoon on Friday. It was early, you know, I suppose maybe one or two in the afternoon.

Q. How did the conversation take place? A. Well, when he called me, that's what we talked about, and he said he would drop them off on his way home from work, and then, because his wife was waiting for him, he called and told me that he couldn't bring them then, he would bring them down the next day.

. . .

Q. All right. During the month of January of 1975, would you have seen the defendant? A. Yes.

Q. On how many occasions? A. Once or twice, because it was every—every month, I seen him; usually once a month at least, if not twice. . . .

Q. During those two preceding months, January and February of 1975, did you have any sexual contact with the defendant? . . .

The Witness: Yes. . . .

Q. On those occasions, did you give anything to the defendant, any money, any physical property, goods? A. No.

Q. *Did you receive anything from him?* A. Yes.

Q. *What did you receive?* A. Marijuana. . . .

Q. *Did you receive it on every occasion that you saw him?* A. Yes. . . .

Q. Did you ever discuss with the defendant, receiving marijuana from him? A. Yes. . . .

Q. Well, how many times did you talk about it? A. Well, when he would call on the phone, *marijuana and sex was all that was usually even really talked about.*

. . .

Q. You said that in connection with the marijuana, you also discussed sex with the defendant? A. Yes. . . .

Q. Mrs. Edington, can you tell us the date or the approximate date that you first discussed marijuana with the defendant? A. In October of 1973, I couldn't tell you the exact date.

Q. And when did you first establish the intimate relationship with the defendant? A. About that time.

On cross-examination Edington testified in part:

Q. I gather from the way the prosecutor was conducting his direct examination that you have had sexual relations with Mr. Brown? A. Yes.

Q. How old are you, Mrs. Edington? A. I'll be forty in September.

Q. How old is Jerry Brown? A. He's twenty-two. . . .

Q. Did Davis Faris live with you? A. Yes.

Q. For how long? A. Approximately two—a year and a half to two years.

Q. And your relationship with Jack [defendant] has always been a friendly, compatible sort of relationship? A. Yes.

Q. You didn't expect anything from him, and he didn't really expect anything from you, in terms of friendship, did he? A. Not until the last—since October of 1973. It just kind of got to be a thing.

. . .

Q. Okay. The next time you testified was at the preliminary hearing. Now, you testified that when you began meeting with Chief McDaniel, you always met him in the car, is that right? A. Yes.

Q. And that's when the sexual relations began? A. Yes.

Q. The sexual relations began with getting in the car? A. We always went someplace, we went someplace besides.

Q. But the times are simultaneous, when you talk about getting in the car with Officer McDaniel, you are also talk-

ing about that as being the point in time in which sex began too, aren't you? A. Yes.

Q. And you are also now stating that that's when the marijuana was begun to be given you, is that correct? A. Yes.

Q. And that all began in October of 1973? A. Yes. . . .

Q. —but your statement now is that having met with him twice a month, you had sex with him two or three times a month, and I would like to know how you did that? A. (No response.)

On redirect examination Edington testified in part:

Q. Well, Mrs. Edington, let me give you an opportunity to answer that question; during the months of January and February of 1975, how often did you see Mr. McDaniel? A. About two—not any more than two times a month.

Q. All right, how often did you have sex with him during that period? A. Every time.

I would hold the jury could reasonably infer defendant did not deliver the drugs merely to accommodate, but for his own purposes—sex. If defendant had given Edington a small quantity of marijuana on one occasion as a favor, we would have a different case. But the jury could find that the sexual intercourse and the delivery of marijuana both began in October 1973 and were still going on in February 1975. Defendant and Edington went out about twice a month, which would be about 34 times. This prolonged period of sex and drugs renders the conclusion of a nexus between the sex and drugs almost irresistible let alone reasonable—to say nothing of the rest of the testimony. I would affirm the judgment.

MOORE, C. J., and LeGRAND and REES, JJ., join in this dissent.