**STATE of Iowa, Appellee,**

v.

**Donald Eugene JOHNSON, Appellant.**

**No. 52516.**

Supreme Court of Iowa.

Jan. 9, 1968.

Jesse, LeTourneau & Johnston, by Norman G. Jesse, Des Moines, for appellant.

Richard C. Turner, Atty. Gen., James C. Sell, Asst. Atty. Gen., Ray A. Fenton, County Atty., and Donald Starr, Asst. County Atty., for appellee.

STUART, Justice.

A Polk County jury found defendant guilty of the crime of drawing and uttering a false check over $20 contrary to section 713.3, Code of Iowa. He has assigned two errors on appeal: (1) In permitting the state to ask questions on cross-examination beyond the scope of the direct examination in violation of sections 781.12 and 781.13, Code of Iowa and his privilege against self-incrimination under the Fifth Amendment to the Constitution of the United States. (2) In overruling defendant's motion to suppress evidence as to signatures for the reason that a signature used as an exemplar was taken from a fingerprint card signed by defendant before he was advised of his constitutional rights under the Fifth and Sixth Amendments.

On July 22, 1966, a man entered Dahl's Food Mart at 48th and University, went to the courtesy counter and wrote a check which he asked to have cashed. The check was drawn on Capital City State Bank, payable to Dahl's in the amount of $30 and signed "D. E. Johnson, 1232 8th Street".

The clerk took the check and asked the man for identification. He showed her his driver's license and she gave him $30 cash. She later became suspicious.

When the man left the store a carry out boy followed him to the car and got the license number. It was recorded on the check. The bank returned the check marked "No account". Prosecution followed. At the trial the clerk and other store employees identified defendant as the party in question.

I. Defendant was called as a witness in his own behalf. After giving his name he was asked the following questions on direct examination:

"Q. Were you, on the 22nd day of July, 1966, in possession of a driver's license? A. No, sir.

"Q. You don't have one? A. No, sir.

"Q. What is your normal procedure in writing your name relative to the letter 'S' in Johnson? A. This one here, the small capital letter 'S'.

"Q. You don't make this kind of an 'S'? A. No, sir."

On cross-examination he was asked:

"Q. Mr. Johnson, I call your attention to State's Exhibit 'E'. Do you always make your 'S' that way? A. Yes, sir.

"Q. Have you always—A. Well, I couldn't really—

"Q. Have you always in the past made it that way? A. I don't know. It's like in grade school, you know, you have like Greg (sic) Shorthand, that's the type I came up under. I guess you get personal writing traits or something. I couldn't say I have always done it that way.

"Q. Did you ever make it like that one (indicating)? A. Whether I have or haven't, I don't know. I suppose I have made one that way, yes, sir.

"Q. I want you to take a look at State's Exhibit 'A'. Have you ever seen that before? A. I can't say that I have.

"Q. Isn't it a fact that you wrote that check, Mr. Johnson?" Over objection that it was not proper cross-examination he answered "Yes, sir."

After further questions he was asked what he did with the check after he wrote it. Objection that it was not proper cross-examination was overruled and he answered that he left it in a room in the Randolph Hotel and did not pass it at Dahl's.

Defendant claims the trial court erred in permitting these questions on cross-examination under sections 781.12 and 781.13 which provide:

781.12 "Defendants in all criminal proceedings shall be competent witnesses in their own behalf, but cannot be called as witnesses by the state."

781.13 "When the defendant testifies in his own behalf, he shall be subject to cross-examination as an ordinary witness, but the state shall be strictly confined therein to the matters testified to in the examination in chief."

These code sections have been substantially the same since 1873 and there are many cases on point.

The state relies primarily upon State v. Shepard, 247 Iowa 258, 265, 73 N.W.2d 69, 73, in which we say:

"It will be observed that in terms this section (§ 781.13) limits the cross-examination of a defendant somewhat narrowly, and it is sometimes contended the cross-examination must be confined to subjects already dealt with on direct examination. We think, however, this argument, properly anlayzed, does not have the restrictive and limiting effect which its proponents claim for it. The broad subject of the direct examination, if material at all, is the guilt or innocence of the defendant."

Wigmore on Evidence, Third Ed., Vol. VIII, § 2276(d), page 448 is cited in support of this view. We repeated this language in

State v. Drosos, 253 Iowa 1152, 114 N.W.2d 526, 531.

Defendant argues at length that we should not follow State v. Shepard, supra, as it renders sterile the intent of the legislature as embodied in section 781.3 and frustrates the manifest purpose of the statute and subjects defendant to a much broader and more searching cross-examination than permitted of an ordinary witness.

Although there appears to be much merit in defendant's argument, we do not need to follow the broad language of Shepard to affirm the trial court here. In our opinion, the two questions asked on direct examination opened the field of inquiry to the extent that the cross-examination was proper as it dealt with matters testified to on direct examination.

■ We assume the questions asked on direct examination were relevant and material to the case. If so, how were they relevant? Why was defendant asked how he made the "S" in his name, Johnson? Obviously because the "S" on the check was made differently. From this he could then argue he didn't sign the check because it wasn't the way he wrote his name. The question on direct therefore dealt with the matter of the making of the check and it was proper on cross-examination to ask defendant directly if he wrote the check.

■ The cross-examination was also proper because an admission that he wrote the check in question with a different "S" than he said he used on direct, would tend to impeach his testimony.

■ Why was he asked on direct examination if he had a driver's license on the day of the crime? The clerk had testified the man who cashed the check produced a driver's license for identification. With his testimony he could argue there was a case of mistaken identity as he had no license and therefore was not the person who cashed the check. The question on direct examination was directed to the

matter of the uttering of the check by defendant. It was proper to ask defendant what he did with the check after having written it.

We believe the cross-examination here is well within the permissible limits established by Iowa authorities other than State v. Shepard, supra. State v. Brown, 253 Iowa 658, 113 N.W.2d 286, 293; State v. Ragona, 232 Iowa 700, 704, 5 N.W.2d 907; State v. Hathaway, 224 Iowa 478, 481–482, 276 N.W. 207; State v. Friend, 210 Iowa 980, 990, 230 N.W. 425; State v. Brandenberger, 151 Iowa 197, 204–205, 130 N.W. 1065; State v. Kuhn, 117 Iowa 216, 229–230, 90 N.W. 733; State v. Chingren, 105 Iowa 169, 172–173, 74 N.W. 946; State v. Watson, 102 Iowa 651, 654, 72 N.W. 283; State v. Eifert, 102 Iowa 188, 195, 65 N.W. 309, 71 N.W. 248, 38 L.R.A. 485; State v. O'Brien, 81 Iowa 93, 95, 46 N.W. 861; State v. Red, 53 Iowa 69, 70, 4 N.W. 831.

In State v. Hathaway, 224 Iowa 478, 481–482, 276 N.W. 207, 209, defendant took the witness stand in her own defense. Direct examination consisted of the following two questions:

"Q. You are the defendant in the case? A. Yes, sir.

"Q. Mrs. Hathaway, did you operate during the spring and summer of 1935 a house of ill fame at 634 Walnut Street in Waterloo? A. No, sir. * * *

"The state then subjected her to a cross-examination covering the period of time set out in the information and concerning what happened at 634 Walnut street in Waterloo, Iowa. It will be noted that the question and answer propounded to the accused by her own counsel on direct examination was the ultimate question which the jury itself was to decide. This question and answer threw wide open the gates for the exploration of whether or not Anna Hathaway did in fact operate a house of ill fame at the place designated and during the said period of time.

"It would, indeed, be a strange doctrine if the appellant were allowed to deny her guilt categorically, and then would be permitted to preclude the state from inquiring into her conduct with reference to the very matter in issue. She took the witness stand of her own free will, as she had a right to do, and by answering one question she denied her guilt. That question covered the time, the spring and summer of 1935; also, whether she was operating a house of ill fame during that period of time. The state had a right to ascertain from her what happened during the spring and summer of 1935 at the residence described. It had a right to ascertain from her what connection she had with the operation of the house at 634 Walnut street, Waterloo, Iowa; and whether she knew what was going on in that house, as testified to by the girls who lived there."

It would be an equally strange doctrine if a defendant could answer questions on direct examination which indirectly amounted to a denial of his participation in certain acts involved and thereby preclude the state from inquiring directly into the very same matters.

A similar attempt to evade cross-examination in the manner suggested above was made in State v. Eifert, 102 Iowa 188, 195, 65 N.W. 309, 71 N.W. 248, 38 L.R.A. 485. We said:

"It is strenuously urged that the court erred in permitting certain questions to be asked the defendant on cross-examination. It appeared from the direct examination that the defendant undertook to state his connection, or rather want of connection, with the making of the alleged deposit. He testified that he left town that morning early, and went to Waverly; that, prior to going, he had a conversation with his son about receiving deposits on that day; that he told him he was going to Waverly to look the ground over; and that, if things did not look favorable, he would send the son a telephone message, through a party

who was with him, not to receive any more deposits, and to stop doing business; that he sent the message to his son to stop doing business, and not to receive any more deposits. On cross-examination, over the defendant's objection, he was required to testify when he returned from Waverly to Tripoli, and how long he remained in Tripoli, and as to whether he found any deposits had been made after 2 o'clock that day. The law, undoubtedly, is that the cross-examination must be confined to the matters about which the direct testimony is given. It is contended that on cross-examination the state was limited to what the defendant did at Waverly. We do not think so. The defendant was put upon the stand to show that Mohling's deposit was received without his knowledge and against his instructions; and to show such facts, he testified as we have stated. The defendant having undertaken to explain his connection, or want of connection, with this deposit, and to show that it was received without his knowledge and against his will, any line of cross-examination which tended to contradict his testimony in chief, or which more fully disclosed his connection with this deposit, was proper."

Here defendant was put on the stand to indirectly deny the signature and the uttering. This examination gave the State the right to ask him directly about these two matters.

In cases in which we have held the permitted cross-examination was beyond the scope of the direct examination to the extent that the trial court's discretion was exceeded and the cross-examination constituted reversible error, the matters inquired into were in no way related to the direct examination.

In State v. Frese, 256 Iowa 289, 127 N.W. 2d 83, defendant in a rape case admitted his presence at the scene but denied having intercourse with the prosecuting witness and claimed she consented to intercourse with others. The cross-examination was directed to the present whereabouts of the others who had been imprisoned after convictions growing out of this incident.

In State v. Leuty, 247 Iowa 251, 73 N.W. 2d 64, defendant, charged with incest with his daughter, testified on direct of her hostility toward him because of his separation from her mother. He was cross-examined as to an illicit relationship with another woman.

In State v. Yarham, 206 Iowa 833, 837–838, 221 N.W. 493, defendant was charged with obtaining a note by false pretenses. On cross-examination he was required to answer whether the U. S. Post Office Department had denied him the use of the mails in his rug business. The matter "did not tend in any manner to prove the charge in the instant indictment".

In State v. Burris, 194 Iowa 628, 634–636, 190 N.W. 38, a negro charged with murder was asked questions on cross-examination which intimated he had associated with white girls on past occasions not related to the charge for which he was on trial.

In State v. Campbell, 129 Iowa 154, 155, 105 N.W. 395, the defendant charged with bootlegging on direct examination denied selling to some named persons and said he prescribed whiskey as medication for others. On cross-examination he was asked if there was a civil suit against him by the wife of a man whom she claimed was injured while intoxicated by liquor purchased from this defendant. He was also asked if the suit had been settled.

See also State v. Scott, 194 Iowa 777, 782–783, 190 N.W. 370.

We therefore hold the court did not err here in permitting the cross-examination complained of as defendant had opened inquiry into these fields by his questions on direct examination.

■ II. We need not consider at length defendant's constitutional argument in view

---

of our holding above. As we have held the cross-examination was within the scope of the direct examination, defendant, to that extent, waived his privilege against self incrimination under the cases cited by defendant. Reagan v. United States, 157 U.S. 301, 305, 15 S.Ct. 610, 611, 39 L.Ed. 709; Brown v. United States, 356 U.S. 148, 155, 78 S.Ct. 622, 626, 2 L.Ed.2d 589; United States ex rel. Irwin v. Pate, 7 Cir., 357 F.2d 911; Fitzpatrick v. United States, 178 U.S. 304, 315, 20 S.Ct. 944, 44 L.Ed. 1078.

III. Following defendant's arrest, Lieutenant Carroll Dawson, who is in charge of the Des Moines Police Department's Identification Bureau, took his fingerprints and observed him place his signature on the fingerprint cards. Lieutenant Dawson testified he compared that signature with the one on the check and concluded the check was written by defendant. Mr. Duane L. Barton, assistant director and document examiner of the Iowa Bureau of Criminal Investigation also testified that in his opinion the two handwriting specimens were "authored" by the same person.

Defendant moved to suppress the evidence of these two witnesses because the signature on the handwriting exemplar was obtained without informing defendant of his right to protection against self incrimination under the Fifth Amendment and his right to counsel under the Sixth Amendment to the United States Constitution.

These specific matters have been decided adverse to defendant's contentions in Gilbert v. State of California, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967) where the Supreme Court held "the taking of the exemplars did not violate petitioner's Fifth Amendment privilege against self incrimination" and "the taking of the exemplars was not a 'critical' stage of the criminal proceedings entitling petitioner to the assistance of counsel". See also United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149; Schmerber v. State of California, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908.

For the reasons stated the trial court is affirmed.

Affirmed.

All Justices concur.