Darrell E. BIZZETT, Appellant,

v.

Lou E. BREWER, Appellee.

No. 60551.

Supreme Court of Iowa.

Feb. 22, 1978.

Shuminsky & Shuminsky, Sioux City, for appellant.

Richard C. Turner, Atty. Gen., Mark S. Beckman, Asst. Atty. Gen., and Zigmund Chwirka, Woodbury Co. Atty., for appellee.

Considered by MOORE, C. J., and MASON, RAWLINGS, REES, and UHLENHOPP, JJ.

UHLENHOPP, Justice.

In this appeal we pass upon the merits of the application for postconviction relief of Darrell E. Bizzett, whom we will refer to as defendant. Code 1977, § 663A.9. While our review is on error, *Benton v. State,* 199 N.W.2d 56 (Iowa), where a basic constitutional safeguard is involved we independently review the totality of the circumstances. *State v. Cullison,* 227 N.W.2d 121 (Iowa).

Two trials are involved, the original homicide trial in 1971 and the instant postconviction trial in 1976. In the homicide trial a jury convicted defendant. He then appealed, and we affirmed. *State v. Bizzett,* 212 N.W.2d 466 (Iowa). Defendant's then attorney was Mr. Daniel C. Galvin. In the postconviction action the trial court tried the case on the merits and then dismissed the application. Defendant Bizzett again appealed, and that is the proceeding now before us.

Perhaps the substantive facts can most readily be related by quoting from page 467 of our opinion in *State v. Bizzett,* supra:

Dr. Stukel, a veterinarian practicing in nearby Nebraska, came to Sioux City on the evening of August 31, 1970, apparently bent on making a round of the taverns and coincidentally in finding a "party" or "getting a girl." The record shows he was at one or two drinking establishments early in the evening and sometime around midnight found his way to the 711 Club, where the events culminating in his death got underway. There he met defendant who was working as a bartender. The two engaged in conversation from time to time as defendant served him a number of drinks, the number of which remains the subject of some dispute.

When the 711 Club closed at about 2:00 A.M., defendant and Stukel left together. They walked several blocks toward the home of one Gerald Lee, who is described as a bootlegger, intending to buy more whiskey. Apparently defendant was forbidden to take whiskey from his place of employment. On the way toward Lee's house, the two met Debra Eggers and Tom Farmer. Debra and defendant had been acquainted for several years but defendant had not known Farmer previously. The group then continued on toward Lee's house, during which time Debra overheard defendant suggest to Farmer that they "roll this guy."

At Lee's house, defendant went in alone to buy the whiskey. The other three remained outside. Defendant shortly returned with a bottle of whiskey and the four proceeded, at Debra's suggestion, to the playground at Webster school, which was both secluded and close at hand.

Arriving there, they indulged in further drinking. It was here defendant told Debra he would give a signal by snapping his fingers and Farmer should then "knock Stukel out." At defendant's request, Debra passed this bit of information along to Farmer. Within a few moments, defendant gave the prearranged signal, Farmer knocked Stukel to the ground, and the two men—Farmer and defendant—began going through their victim's pockets. When it appeared Stukel was not out, defendant said he would "take care of that." According to Debra, he then jumped and stomped on the doctor's head and face. Almost immediately he began to bleed profusely, the attackers became alarmed, and all fled from the scene.

After leaving the school yard someone—both defendant and Debra take credit for it—called the police to report an injured man lying in the school yard. The police came, found Stukel in a dying condition, and removed him to St. Vincent's Hospital, where he expired within the hour.

In this postconviction proceeding defendant urges that his homicide conviction should be set aside for several reasons which he summarizes in the conclusion of his brief: (1) he did not have effective counsel because of a conflict of interest on the part of his then attorney and because of his attorney's failure to take discovery depositions or statements; (2) a detective vio-

lated defendant's *Miranda* rights; (3) after trial defendant discovered new evidence which would exculpate him; and (4) the police unconstitutionally seized his shoes.

■ I. *Effective Counsel.* We first consider the contention regarding conflict of interest. Defendant had an undoubted right to an attorney with undivided loyalty, dedicated to the protection of defendant's interests. *Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799.

Defendant's principal contention in this connection is that Mr. Galvin also represented Willie Earl Rucker, helped Rucker secure immunity in return for testifying, and therefore treated Rucker lightly on cross-examination in the homicide trial. Due to the gravity of this charge we have examined it with special care. In the homicide trial Rucker gave damaging testimony for the State which we summarized in the prior appeal on page 470.

Defendant arrives at his conclusion that Mr. Galvin represented both Rucker and defendant mainly from the following testimony by Mr. Galvin at the postconviction trial:

> My initial awareness of this offense or of the facts leading up to it being filed came from Willie Earl Rucker, who it later developed was a—one of the principal witnesses against Darrell on the trial. Willie Earl Rucker was a fellow that I had known and for whom I had done some legal work prior to the time of this alleged offense, and Willie Earl contacted me by telephone, and asked me to come to the Sioux City police station and intervene on his behalf in seeking to get immunity from prosecution. And I went to the police station, and I met with Willie Earl, and I am hesitating because I don't want to invade the client-attorney privilege that could be available to Mr. Rucker as well. But I learned from Mr. Rucker in considerable detail of facts concerning the death of Dr. Stukel. And in his version to me of what occurred, Mr. Rucker, without identifying the person who he considered to be the one responsible, explained where he, Willie Earl Rucker, had

been, what he had observed, that he had followed Darrell Bizzett and Tom Farmer and Debra Eggers, and that he and Herman Cresswell had assumed a vantage point behind some bushes and above a wall overlooking the school ground, and that he had observed the physical acts in relation to Dr. Stukel, and he had asked, as I earlier indicated, that I accompany him to the detective bureau, he was in— at the time I talked to him the first time, he was in the police station, on the second floor, and I believe had an appointment with some of the detectives. I think Bob Worden was then a detective. I am sure he was. And I think he had an appointment with him with others. And after we had talked for a couple of hours, I told Rucker that I had one reservation about interceding for him or appearing with him and making this request for immunity, and I said, "That's a concern that I might find that the person that you are accusing is someone known to me, perhaps a client or a friend, and I don't want you to name any names, but is that possible?"

And he said, "Well, it is." He said, "It's a friend of yours. It's a client of yours. You have known him for a long time."

I said, "Well, I don't want to know anymore about it. I should leave and I will." I said, "If you want me to make any phone calls for you to procure some other attorney to go with you, I will do that."

And he asked who I would recommend, and I recommended Don Sylvester to him. I don't remember if I made the call or if he made it, but I then left.

So that was my initial introduction, in a sense, and I gained from that interview a lot of detail that assisted me in further inquiring that I did.

Like the trial court, from Mr. Galvin's testimony and the remaining record we arrive at a conclusion contrary to defendant's view. Mr. Galvin's first contact with the case came from Rucker's call. Rucker told his story to Mr. Galvin—and the story

matched Rucker's later testimony. Mr. Galvin properly inquired, as attorneys not infrequently must do, whether Rucker was accusing "someone known to me, perhaps a client or a friend. . . . " When Rucker responded affirmatively, Mr. Galvin promptly recommended someone else as attorney for Rucker, and departed.

The record of the homicide trial certainly does not indicate Mr. Galvin "threw" the case. Naturally defendant is bitter toward Rucker. But it is very easy to second-guess trial counsel, to read a trial transcript and say that this or that could have been done differently. Mr. Galvin had a very difficult case on his hands; the State's eyewitnesses made the defense an uphill battle all the way; the evidence disclosed a cruel and heinous crime; and Mr. Galvin appears to have struggled manfully to preserve and protect defendant's rights in an unpopular cause. At the conclusion of the homicide trial, the experienced Judge Stilwill stated to counsel:

> The Court: I think I should say that this case has been excellently tried. I want to compliment both sides of the table for it. Mr. Galvin, I think you have done an excellent job.
>
> Mr. Galvin: Thanks.
>
> The Court: It was a very difficult case. Thank you very much.

■ Upon review of the record, we conclude that defendant's charge of divided loyalty is not substantiated. A very similar case is *United States v. Donatelli*, 484 F.2d 505 (1 Cir.).

We next consider the ineffective counsel contention based on insufficient pretrial preparation, particularly with reference to absence of discovery depositions and witnesses' statements. As to the applicable standard of competence, see *State v. Lemburg*, 257 N.W.2d 39 (Iowa); *Long v. Brewer*, 253 N.W.2d 549 (Iowa); and *Wycoff v. State*, 226 N.W.2d 29 (Iowa). See also *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342; *Geders v. United States*, 425 U.S. 80, 96 S.Ct. 1330, 47 L.Ed.2d 592; *Tollett v. Henderson*, 411 U.S. 258, 93 S.Ct. 1602, 36 L.Ed.2d 235; *Parker v. North Car-*

*olina*, 397 U.S. 790, 90 S.Ct. 1458, 25 L.Ed.2d 785; *McMann v. Richardson*, 397 U.S. 759, 90 S.Ct. 1441, 25 L.Ed.2d 763; *Brady v. United States*, 397 U.S. 742, 90 S.Ct. 1463, 25 L.Ed.2d 747.

Again Mr. Galvin's performance is not to be judged by hindsight. At the time of the homicide prosecution, discovery depositions were unavailable to defendants in criminal cases. *State v. District Court in and for Delaware County*, 253 Iowa 903, 114 N.W.2d 317. Not until 1974 did this court change the rule, in *State v. Peterson*, 219 N.W.2d 665 (Iowa). Moreover, we do not intimate that "competency" of counsel necessarily means the witnesses must always be deposed; in a given situation depositions may be unnecessary or bad strategy or be inadvisable for other reasons.

The same may be said of statements. The record shows that Mr. Galvin engaged in energetic trial preparation, and he had the additional problem, not uncommon with defense counsel, of hostile witnesses.

Defendant criticizes Mr. Galvin's handling of the defense in other ways. Our examination of the case persuades us again that his conduct was within the realm of normal competency, considering the case he had to work with. He is an attorney with extensive criminal defense experience. Some of the additional criticisms of his work in the homicide case constitute further second guessing. For example, defendant would have had Mr. Galvin cross examine some witnesses in greater detail. Lay defendants quite often want their attorney to cross examine a hostile witness more fully, evidently thinking that somehow the witness will magically change his testimony favorably to the defense—whereas counsel knows that lengthy cross-examination will only drive home the witness' original testimony for the State.

■ We conclude from the record that Mr. Galvin's performance was reasonably competent.

II. *Miranda.* Defendant contends a detective obtained statements from him without a *Miranda* warning. No such warning

was given on the occasion involved. The question is whether defendant in custody or deprived of freedom in any significant way. See *Miranda v. Arizona*, 384 U.S. 436, 478, 86 S.Ct. 1602, 1630, 16 L.Ed.2d 694, 726, reh. den. 385 U.S. 890, 87 S.Ct. 11, 17 L.Ed.2d 121. The Court there stated, "To summarize, we hold that when an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized." The Court also stated, however, "Our decision is not intended to hamper the traditional function of police officers in investigating crime." 384 U.S. at 477, 86 S.Ct. at 1629, 16 L.Ed.2d at 725. See *State v. McDonald*, 190 N.W.2d 402, 404 (Iowa).

On the night of the homicide, which occurred at some distance from the 711 Club, defendant was a bartender at that club. Lt. Robert Worden, a detective, subsequently investigated the crime. He thought that Dr. Stukel had been at the club. He called defendant to the station house and interviewed him, after which defendant left. The inquiry had not then narrowed on defendant, nor was defendant arrested. Lt. Worden testified at the homicide trial:

On or about September 1, 1970, or thereafter I became involved in an incident concerning Doctor Robert Stukel. I was in charge of the investigation.

Subsequent to that date I had conversation with the defendant, Darrell Bizzett. I first talked to him September 9, in the Detective Bureau at the police station. We asked him to come down to the police station so he could be interviewed and give us some help in this investigation.

At that time we had no idea who the responsible party was.

At the time I had conversation with the defendant, Sergeant Dale Wilson of the Detective Bureau was present. We talked to him fifteen or twenty minutes.

We told him we were working on the case and had reason to believe Doctor Stukel had been at the 711 Club where Darrell was employed, and asked him if he had seen Doctor Stukel that particular night, that is August 31, or the early morning of September 1. We showed him a picture of Doctor Stukel and he said that he had never seen a person that looked like this picture we showed him, and that he had never heard of Doctor Stukel. He said that he did work that particular night, August 31, and the early morning of the 1st, waiting on tables. This is his grandfather's tavern where he works. He said there were several white people in there at that time, but I believe he told me he knew them.

The picture of Doctor Stukel that I showed him was a full length picture; I believe it was a wedding picture which I had procured from Mrs. Stukel.

Also:

Q. Now, have you related to the best of your recollection the entire conversation you had with Darrell Bizzett at that time and place? A. I told Darrell we were at a standstill on this case, we had run down numerous leads to no avail, that everything pointed—certain things pointed he had been in this tavern that night and—

Q. Who had been in that tavern? A. Doctor Stukel. We would appreciate any effort or any information he could give us on this investigation. This was strictly an interview, looking for information.

Q. Do you recall anything else? A. But he just denied he had seen the Doctor, or this party, in the tavern that night, or that he had ever seen him before.

■ We hold that this questioning comes within the legitimate investigative function when the interviewee has not been taken into custody or deprived of freedom in any significant way. Similar cases are *Oregon v. Mathiason*, 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714; and *Beckwith v. United States*, 425 U.S. 341, 96 S.Ct. 1612, 48 L.Ed.2d 1. See also, *State v. McDonald*, 190 N.W.2d 402, 404 (Iowa) (quoting *Miranda*: " 'The limits we have placed on the interrogation process should not constitute an un-

due interference with a proper system of law enforcement. As we have noted, our decision does not in any way preclude police from carrying out their traditional investigatory functions.'"); *South Dakota v. Long*, 465 F.2d 65 (8 Cir.), cert. den. 409 U.S. 1130, 93 S.Ct. 951, 35 L.Ed.2d 263; *United States v. Tobin*, 429 F.2d 1261 (8 Cir.); *Hicks v. United States*, 127 U.S.App. D.C. 209, 382 F.2d 158; *Evans v. United States*, 377 F.2d 535 (5 Cir.).

Lt. Worden did not violate the *Miranda* rule.

III. *New Evidence.* Section 663A.2(4) of the Code provides for postconviction relief where "[t]here exists evidence of material facts, not previously presented and heard, that requires vacation of the conviction or sentence in the interest of justice . . . ." We have examined the items of evidence which defendant contends require vacation of the conviction in the interest of justice, but do not find them to be of a "material" nature.

Defendant emphasizes one item in particular relating to State's witness Debra Eggers. Tom Farmer testified by deposition in the postconviction proceeding that Eggers was a prostitute who had agreed to sell herself to Dr. Stukel after she overheard defendant and Farmer planning to "roll" Stukel. We have striven to see how this item would be material or change the result. Certainly the homicide jury must not have thought that Eggers, who with several men in the middle of the night was strolling the street and drinking whiskey at a playground, was one of the city's respected matrons.

We arrive at the same conclusion as the trial court that the new evidence is not of a nature warranting vacation of the conviction in the interest of justice. In nearly every case additional pieces of evidence of one kind or another can be found post-trial. See *State v. Sims*, 239 N.W.2d 550 (Iowa).

IV. *Seizure.* Finally defendant contends the police unconstitutionally took his shoes from him when he was in custody at the station house following his arrest on the homicide charge. The police acted constitutionally. *United States v. Edwards*, 415 U.S. 800, 94 S.Ct. 1234, 39 L.Ed.2d 771; *Cupp v. Murphy*, 412 U.S. 291, 93 S.Ct. 2000, 36 L.Ed.2d 900; *State v. Morris*, 227 N.W.2d 150 (Iowa); *State v. Salazar*, 213 N.W.2d 490 (Iowa).

We hold that the trial court properly dismissed the postconviction application.

AFFIRMED.