STATE of Iowa, Appellee,

v.

Lonnie COOK, Sr., Appellant.

No. 67947.

Supreme Court of Iowa.

Feb. 16, 1983.

Francis C. Hoyt, Jr., Appellate Defender, and Patrick R. Grady, Asst. Appellate Defender, Des Moines, for appellant.

Thomas J. Miller, Atty. Gen., Michael Jordan, Asst. Atty. Gen., and Patrick R. McCormick, County Atty., for appellee.

Considered by REYNOLDSON, C.J., and UHLENHOPP, HARRIS, McCORMICK, and CARTER, JJ.

UHLENHOPP, Justice.

The principal issue in this appeal involves the *Miranda* rule and is largely factual. We review the record de novo on this issue in the light of the totality of the circumstances. *State v. Snethen,* 245 N.W.2d 308, 311 (Iowa 1976). Upon so examining the record we find the facts to be substantially as follows.

Defendant Lonnie Cook, Sr. is presently 21, was neglected and physically abused as a child, had ten years of education, spent some of those years in a school for the learning disabled, received "zeroes and Fs" in school except in English and art, was periodically under the care of a psychiatrist, as a juvenile was often in trouble and committed a number of thefts, and sometimes lived in foster homes. As an adult, defendant has a severe alcohol and drug problem, has low-average intelligence, and suffers from a "severe passive-aggressive personality disorder." A reading of defendant's testimony discloses a person who is aware of police operations and juvenile and criminal affairs.

We further find the facts to be these. On November 26, 1980, Louis Christy was found dead in his home of a beating with a club. Officer Robert Bean was directed to investigate. In checking the home he discovered a bill of sale to the victim for a revolver. The bill was signed by defendant and was dated November 20, 1980. Bean testified:

Q. What was the significance of this note [sic], as far as you were concerned? A. Well, at that point we did not have anybody that had seen the victim around for at least one or two days or possibly longer; and it was thought that if Lonnie had been there on the 20th, that maybe he had had contact with the victim since that time.

Q. And what would—of what interest was that to you as an investigator in the case? A. Well, possibly helping to fix the time of death or at least the last time that this person might have been seen, both inside or outside of his home.

After examining the home and the body, Bean returned to the police station:

Q. Did you meet with anybody at the police department? A. Yes. Lieutenant O'Keefe and myself met with Officer Pete Groetken, Officer Heibel and I believe at that time Officer Noltze.

Q. And what was the subject of the meeting? A. Well, it was just more or less to brief them as far as the death itself and to request their assistance as far as going out and talking to the neighbors and so forth.

Q. Was—or did Lieutenant O'Keefe give anyone assignments after this discussion? A. Yes. He sent Heibel and Officer Noltze out to talk to some of the neighbors in that particular neighborhood of the victim, and he had myself and Officer Groetken attempt to contact Lonnie Cook in reference to the bill of sale.

Bean was acquainted with defendant from the latter's juvenile problems. Bean and Officer Groetken proceeded to the Barclay home—the Barclays are parents of defendant's wife. Defendant answered the door. Bean testified:

I informed Lonnie that we were investigating a death in the Greenville area on West Second [sic] and that due to the fact a bill of sale had been found made out by him to the victim for the sale of a handgun, that we wished to speak with him for a minute in reference to that.

. . . .

The defendant informed us that on the morning of the 26th—he thought it was around 10:30 a.m.—his father and himself had been to the Christy residence on East Second Street. He said at that time his father apparently had painted the victim's house and wanted to talk with him, and they had stopped out there; and apparently, his father went up there and

knocked on the door and didn't receive any answer. He came back out and got in the vehicle, and they left.

Q. What did you say? A. I told Lonnie at that time that I thought that the fact that they had been there around 10:30 in the morning and did not receive any answer might be helpful as far as determining the time of death, and I did ask him if he would be willing to come to the police department on the morning of the 27th and give us a written statement insomuch as to try—concerning the sale of the handgun and the fact that his father had been there on the morning of the 26th at 10:30 a.m. and did not receive any answer at the door.

Q. What did the defendant say to that? A. He indicated that he would be willing to come in and give us a statement to that effect.

Q. Was the issue of how he would be transported down to the police station discussed? A. Lonnie's father-in-law indicated that if we wanted Lonnie down there at 10:00 a.m., that we would have to pick him up due to the fact that it was Thanksgiving and he apparently had things to do.

Q. To your knowledge, does the defendant own an automobile or did he at that time? A. To my knowledge, he did not at that time.

Q. Did—after this subject of how the defendant might get down to the police station was discussed, did you reach an agreement as to how the defendant would come down to the police station? A. Yes. We informed them we would come out in the morning and pick him up about 10:00 a.m., and we would return him as soon as we were done.

Q. And did the defendant agree to that? A. Yes, he did.

Q. Was he at any time told in the evening hours of Wednesday by you or Sergeant Groetken that he was required to come down to the police station? A. No, no.

Q. Was he told he was under arrest or suspected of anything? A. No, no.

As agreed, Bean and Groetken returned to the Barclay home the next morning. Defendant accompanied them to the police station. Bean testified:

Q. And again, at this point was he told he was under arrest? A. No.

Q. Was he under arrest? A. No.

Q. Was he required to go down to the police station by you? A. No.

Q. He went voluntarily? A. Yes.

Q. Was he handcuffed? A. No.

Q. Was he in any way restrained physically? A. No.

Q. Did you draw your weapon? A. No.

Q. Did you discuss with him how he was going to get home from the police station? A. I told him as soon as we were done that we would bring him back.

At the police station the men went into an office, and Bean then went into a nearby room to fix coffee. While he was there, Officer Heibel came into the coffee room and asked Bean if he had seen what appeared to be a stain on one of defendant's shoes—defendant was wearing tennis shoes. Bean had not seen the stain. He and Heibel returned to defendant and asked him if he would remove his left shoe. Bean testified:

A. At that time Lonnie did take the shoe off, and he handed it to me; and I took the shoe and stepped over towards the window. And in looking at the stain, you know, it appeared as though it could have been blood. I wasn't sure. I went back, and I asked Lonnie if he had any idea what that was. He told me at that time that he thought it was ketchup and asked him how that would have gotten on his shoe, and he said that he recently had worked at Sambo's as kind of a combination busboy and dishwasher and that he thought that he had picked that stain up on the job.

Q. And what did you say? A. I, at that time, asked him to remove his other shoe; and I told him that we would like to keep the shoes and send them into the State Lab to have the stain analyzed to see what the substance was.

Q. Did he object to this? A. No, he did not.

Q. Was he free to leave at this point if he wished to? A. Yes, yes.

Q. And how would he have gotten home after you had taken the shoes for analysis purposes? A. We could have went up to the jail and got another pair of tennis shoes, and we would have gave him a ride back.

Q. As you did with Mr. McFadden? A. Yes.

Q. After you told him you were going to keep these shoes for analysis, what, if anything, was said or happened? A. He, at that point, said, "All right." He said, "I've got something I want to tell you."

Q. And what did you say? A. And I asked him, "What is that?" And he, at that time, said that he had been out to the house and that he had found the victim; and when he found the victim, the victim was dead.

Q. And what did you say? A. At that point I advised him not to go any further. I left the room. I went and got a waiver of rights form. I brought the form back into the room, and I sat down and read Lonnie his rights from that form.

Q. Let me show you, Officer Bean, a document entitled, "Warning Statement to a Person, in Custody." Do you recognize that? A. Yes, I do.

Q. And what is that? A. This is the waiver of rights form that I read Lonnie his rights from. He signed it, indicating that he understood those and was willing to talk with us; and this was witnessed by both myself and Officer Heibel. The place is the Investigation Division. Date is 11–27 of '80, and the time is 10:25 a.m.

The document contained the *Miranda* warnings.

At the time defendant was not sleepy, intoxicated, under the influence of drugs, or physically impaired.

Bean further testified:

Q. And then what happened? A. We proceeded to go back. We covered much of the same territory as far as how he got the stain on his shoe.

Q. When you say that, could you tell the Court what you mean, you "covered much of the same territory"? A. As far as how the stain come to be on his shoe. I again told him that we were going to send his shoes to the State Lab to have the substance analyzed. And if it turned out to be blood, that we would have it compared with the blood of the victim.

Q. And as of this point when he is again talking about the stain on the shoe, was he free to leave? A. Yes, he was.

Q. Were you restraining him in any way? A. No.

Q. Did he ever state to you that he wished to leave? A. No.

Q. Did he state he wished an attorney? A. No.

Q. Did he state he wished that you stopped questioning him? A. No.

Q. What happened then? A. At that point he indicated that when he found the body of the victim, that he had attempted to check to see if the victim was still alive; and he indicated that he might possibly have kicked the victim in the head, and that's how he come to have the blood on his shoe.

Q. And then what happened? A. I told him at that time that I did not feel that he was telling us everything; that he was filling in bits and pieces as we went along, and I felt that he had more that he should be telling us.

Q. And then what happened, Officer? A. He made the statement that, "Well, I'm probably going to go to jail; but I'll tell you. I killed the guy."

After some changes in his version of events, defendant made an extended statement of them to a shorthand reporter. He admitted killing the victim with a club.

The officers arrested defendant, booked him, and placed him in jail. The county attorney subsequently charged him with murder, robbery, burglary, and theft, all in the first degree.

Before trial, defendant moved to suppress his statements given to the officers. After

hearing, the district court denied the motion. Defendant stood trial, the jury found him guilty on all counts, the trial court passed sentence, and defendant appealed.

I. *Defendant's statements before and after Miranda warning.* Defendant first argues that his statements at the police station prior to the *Miranda* warning were inadmissible in evidence because he was in custody and the statements flowed from police interrogation. From this he argues that all the fruits of those statements must also be suppressed.

■ A. Regarding the concept of *custody,* the United States Supreme Court stated in *Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694, 706 (1966):

By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.

*See also Beckwith v. United States,* 425 U.S. 341, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976); *Bizzett v. Brewer,* 262 N.W.2d 273 (Iowa 1978). Custodial interrogation does not include investigatory questioning without custody, *State v. McDonald,* 190 N.W.2d 402, 404 (Iowa 1971), basic identification questioning, *State v. Beatty,* 305 N.W.2d 496 (Iowa 1981), or general on-the-scene questioning. *State v. Brown,* 176 N.W.2d 180, 182 (Iowa 1970).

Two decisions which illustrate the parties' opposing positions on custody are *Oregon v. Mathiason,* 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977) (per curiam), and *United States v. Digiacomo,* 579 F.2d 1211 (10th Cir.1978). In *Mathiason* the victim of a burglary told a policeman she suspected a certain parolee. The policeman left a note at the parolee's apartment asking the parolee to call the policeman so that they could discuss something. When the parolee did so the policeman suggested they meet at a nearby state patrol office. The parolee arrived at the office, and the policeman took him into a room, told him he was not under arrest, closed the door, falsely stated that the parolee's fingerprints had been found at the burglary scene, and said he believed the parolee was involved in the burglary.

Within five minutes the parolee confessed. The policeman then gave the *Miranda* warning and taped the confession. The Court held that when the parolee originally confessed he had not been in custody or deprived of his freedom of action in any significant way so as to require the *Miranda* warning. After citing its previous cases, the Court stated:

In the present case, however, there is no indication that the questioning took place in a context where respondent's freedom to depart was restricted in any way. He came voluntarily to the police station, where he was immediately informed that he was not under arrest. At the close of a ½ hour interview respondent did in fact leave the police station without hindrance. It is clear from these facts that Mathiason was not in custody or otherwise deprived of his freedom of action in any significant way.

Such a noncustodial situation is not converted to one in which *Miranda* applies simply because a reviewing court concludes that, even in the absence of any formal arrest or restraint on freedom of movement, the questioning took place in a "coercive environment." Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime. But police officers are not required to administer *Miranda* warnings to everyone whom they question. Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect. *Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him in custody. It was *that* sort of coercive environment to which *Miranda* by its terms was made applicable, and to which it is limited.

*Id.* 429 U.S. at 495, 97 S.Ct. at 714, 50 L.Ed.2d at 719.

In *Digiacomo* the defendant was suspected of passing counterfeit notes. Two secret

service agents saw the defendant drive up to a restaurant accompanied by a woman. They approached the defendant, identified themselves, said they wanted to talk about some counterfeit notes the defendant had passed, and asked him to wait with them in the parking lot until two other agents arrived. When the other agents arrived about five minutes later, one of the agents advised defendant of some of his *Miranda* rights but did not include all of them. The defendant then gave information to the officers, produced bills including a counterfeit one, and made inculpatory statements. The agents told him he could be arrested or he could appear "voluntarily" the next morning at the secret service office. He appeared at the office the next morning, gave further incriminating information as to the source of the notes, and was allowed to leave. The court held the agents' actions in the parking lot were functionally equivalent to an arrest and required the *Miranda* warning. The defendants' statements and the fruits of a search following were suppressed.

B. Regarding the concept of *interrogation* under *Miranda,* the United States Supreme Court stated in *Rhode Island v. Innis,* 446 U.S. 291, 301, 100 S.Ct. 1682, 1689–90, 64 L.Ed.2d 297, 308 (1980):

> [T]he term interrogation under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police.

The Court held in *Innis* that officers in a police car did not interrogate when they commented in the defendant's presence that a missing shotgun from the crime could pose a safety hazard to handicapped children at a nearby school. *But cf. State v. Snethen,* 245 N.W.2d 308 (Iowa 1976) (use of confrontation between mother and the defendant stressing exoneration of the defendant's brother constituted interrogation). *See also State v. Hilpipre,* 242 N.W.2d 306 (Iowa 1976).

■ C. Regarding the *ambit* of *Miranda,* warnings are not required for taking physical evidence such as blood samples, *State v. Epperson,* 264 N.W.2d 753 (Iowa), *cert. denied,* 439 U.S. 913, 99 S.Ct. 285, 58 L.Ed.2d 260 (1978), handwriting exemplars, *State v. Sefcheck,* 261 Iowa 1159, 157 N.W.2d 128 (1968), or fingerprints. *State v. Johnson,* 261 Iowa 661, 155 N.W.2d 512 (1968).

■ D. Regarding evidence obtained *after* illegal police conduct has occurred, that evidence must be suppressed if it " 'has been come at by exploitation of that illegality....' " *Wong Sun v. United States,* 371 U.S. 471, 488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441, 455 (1963) (quoting *Maguire, Evidence of Guilt* 221 (1959)).

■ E. Turning to the facts here, we hold that defendant was not "in custody" when Bean and Groetken visited with him at the Barclay home. We also hold that he was not in custody the next morning when Bean and Groetken took him to the station, or when they there had an oral exchange with him about the spot on his shoe and asked for his shoes. *Oregon v. Mathiason,* 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977); *Barfield v. Alabama,* 552 F.2d 1114 (5th Cir.1977); *United States v. Robinson,* 523 F.Supp. 1006 (E.D.N.Y.1981); *Borodini v. Douzanis,* 455 F.Supp. 1022 (D.Mass. 1978). In addition, their request for his shoes did not itself require a *Miranda* warning because it involved physical evidence and not a communication from defendant's mind.

■ Moreover, we do not think defendant was in custody when he volunteered, "I've got something I want to tell you," when Bean answered, "What is that?", and when defendant responded he had been out to the house and found the victim dead. This exchange is also admissible because it originated with defendant; we do not be-

lieve that the officers should have known their prior question about the stain on the shoe, and their obtaining the shoes, were reasonably likely to precipitate volunteered statements by defendant.

■ Bean then gave the *Miranda* warning. Defendant confessed to the homicide after that warning. He contends that he confessed because he had already stated he had been in the house and found the victim, and he relies on *Wong Sun,* 371 U.S. at 488, 83 S.Ct. at 417, 9 L.Ed.2d at 455—the confession was come at by exploitation of the prior illegal questioning. The flaw in this reasoning is that such prior questioning as occurred was not illegal. We thus find neither a direct *Miranda* violation, a violation by way of *Innis,* nor a *Wong Sun* violation. By the same token the subsequent search warrant was valid.

■ II. *Statements made after arrest.* Defendant also claims that his statements were inadmissible as evidence because they were made incident to an illegal arrest. *See Dunaway v. New York,* 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979) (restraint which is indistinguishable from arrest). We have already held, however, that defendant was not restrained initially, and he was therefore not arrested initially. He was arrested after he confessed, and that was a lawful arrest.

■ III. *Voluntariness of Miranda waiver.* Defendant contends any waiver of *Miranda* rights by him was involuntary. We have examined the record de novo and agree with the district court that the waiver was voluntary. *See State v. Davis,* 304 N.W.2d 432 (Iowa 1981); *State v. Fisher,* 279 N.W.2d 265 (Iowa 1979).

IV. *Voluntariness of statements.* On our de novo review we similarly hold that defendant's statements to the officers were voluntary in fact. *See State v. Aldape,* 307 N.W.2d 32 (Iowa 1981); *State v. Jump,* 269 N.W.2d 417 (Iowa 1978).

■ V. *Offers of proof.* Defendant argues that the trial court denied him the right to make offers of proof. Ordinarily refusal to permit the making of an offer of proof is error. 75 Am.Jur.2d *Trial* § 128, at 225 (1974); 88 C.J.S. *Trial* § 73 (1955).

The record does not bear out defendant's claim that the trial court refused him the right to make an offer of proof. On one occasion defense counsel was granted permission to approach the bench where an off-the-record discussion was held. At the conclusion of the discussion the court stated that its previous ruling stood. Defendant did not show by bill of exceptions or otherwise that he asked to make an offer of proof and was denied the opportunity.

On another occasion defense counsel asked to approach the bench or to go into chambers, and permission was denied. Again we have no record of a request to make an offer of proof and a denial. We do not presume error. *Jacobs v. City of Cedar Rapids,* 181 Iowa 407, 412, 164 N.W. 891, 892 (1917).

■ VI. *Hearsay objection.* Defendant contended at trial that his hand was injured during a scuffle with the victim. The prosecutor asked Officer Bean as a witness what the results were of X-rays taken of defendant's hand. Over defense counsel's objection of hearsay, Bean answered, "To my knowledge, the X-rays did not show any type of break or anything." Defendant now asserts that "obscured" hearsay was involved: Bean must have been testifying from what someone told him the X-rays showed.

The record as made does not show obscured hearsay; Bean prefaced his answer with "To my knowledge". If Bean saw the X-rays himself but is not competent to read them, incompetency would be the proper ground for objection to the question or for motion to strike the answer—not hearsay. 31 Am.Jur.2d *Expert and Opinion Evidence* § 154, at 716 (1967); 32 C.J.S. *Evidence* § 546(92), at 344 (1964). The record as made is insufficient to demonstrate ground for reversal.

We uphold the judgment and sentence.

`AFFIRMED.