**In the Interest of J.A.N., a child, Appellee.**

**No. 83–564.**

Supreme Court of Iowa.

March 14, 1984.

Thomas J. Miller, Atty. Gen., John P. Messina, Asst. Atty. Gen., and Roger A. Huddle, County Atty., for appellant.

Michael J. Schilling, Burlington, and Frank Nidey, Cedar Rapids, for appellee.

Considered by HARRIS, P.J., and McGIVERIN, LARSON, SCHULTZ, and CARTER, JJ.

HARRIS, Justice.

This is a juvenile delinquency proceeding in which a 14½ year old boy was charged

with first-degree murder. The juvenile moved to suppress evidence of his confession. We granted discretionary review from the juvenile court's ruling which substantially sustained the motion. We affirm.

On September 19, 1982, a 30 year old man was found stabbed to death in Morning Sun, Iowa. The body was discovered under an abandoned truck near a local tavern. A pathologist estimated the death occurred in the early morning hours of Saturday, September 18. It was also believed cash had been taken from the body because the victim's payroll check stub and empty wallet were found in the bathroom of the tavern. Agents of the department of criminal investigation and local authorities investigating the homicide learned that a 14½ year old boy, J.A.N. (Rocky), had been talking to the victim outside the tavern at approximately 2:00 a.m. on September 18.

Two officers went to Rocky's home on the afternoon of September 20 in an attempt to find him. Rocky's father and stepmother told the officers he was not home and was planning to go to a football game that evening. The officers requested permission to talk to Rocky regarding the investigation and, apparently, the parents told the officers they would have him go to the city hall for an interview.

The Morning Sun city hall was used as, what the officers called, the "command post" for the homicide investigation. Officers met and discussed collected information on the ground floor and conducted frequent interviews upstairs in the city library. Numerous patrol vehicles were parked outside and as many as twelve to fifteen officers occupied the building at any given time. In its brief, the State concedes the city hall had the "aura" of a police stationhouse.

Rocky appeared alone at the city hall at about 7:25 p.m. He first met Lynn Serbousek, an Iowa highway patrolman, who was in uniform and was armed. Rocky then met DCI agent Robert Williams, who was wearing a suit and tie. Each man is middle-aged and quite larger than Rocky. Williams had just interviewed Rocky's sister.

According to Serbousek, as Rocky entered the city hall he said: "I guess somebody wants to talk to me." Serbousek said "yes" after asking for Rocky's name. Serbousek then walked over, put his arm around Rocky's shoulder, and said: "We will go upstairs." As Rocky and the two officers walked upstairs to the library, the officer's arm remained around Rocky's shoulder and he asked, "I thought you had gone to the ball game?" Rocky replied, "I was going to go just as soon as I talked to you people." Rocky said he hoped he would not have to look at any bloody pictures, and Serbousek replied he would not.

Although Rocky was questioned with little interruption for four hours, the juvenile court ruling considered the interrogation as if it had been conducted in three phases. The interview began at 7:30 p.m. Neither Serbousek nor Williams advised Rocky of his *Miranda* rights. Neither officer attempted to communicate with Rocky's parents to obtain written consent to question him.

The library is a large room enclosed by books. Williams, who conducted most of the questioning, sat at a counter. Rocky sat at a desk with Serbousek sitting at his side taking notes. At the outset of the questioning, Rocky indicated he wanted to get the interview over with so he could go to the football game. According to Serbousek, it was immediately apparent Rocky was nervous.

The initial phase of the questioning concerned Rocky's activities on the preceding Friday and Saturday. After having Rocky repeatedly relate his activities, it became apparent his story lacked credibility. He first indicated he had gone home from the tavern on Friday night at 10:30 and watched a television show. Serbousek confronted him about the content of the show and concluded Rocky had not watched it. The officers also confronted Rocky about having been seen outside the tavern on Saturday at 2:00 a.m. Rocky then admitted he had been outside the tavern and had

a conversation with the victim. He also said he had been involved in a fight near the post office with a boy from Winfield, Iowa.

After an hour of questioning, Williams said he needed to take a break and left the library. The juvenile court considered this to be the end of the first of the interview's three phases.

Serbousek then visited with Rocky in the absence of Williams. Rocky was very nervous. He still expressed an interest in going to the football game and was told, "I don't think you will make it to the ball game because there are several discrepancies in your story." Serbousek also told Rocky he wanted him to sit and think about the story he was telling, that he wanted him to tell the truth. After visiting about unrelated matters, he told Rocky that "we will have to get to the bottom of what happened on Friday night."

Presently another DCI agent, Russell Porter, entered the room. He was sent there, according to the sheriff, to ensure that Rocky "did not leave or just to have someone there with him." When Porter arrived, Serbousek left. Rocky again indicated he had planned to go to the football game, and asked how much longer the questioning was going to take. Porter responded he did not know, and that Rocky would have to ask the other officers.

Meanwhile, Williams exchanged information with other officers downstairs. He told them Rocky's account of his activities was inconsistent with other information the police gathered. He learned from the other officers that Rocky was known to carry a knife and was seen spending a twenty dollar bill at the tavern on the afternoon of September 18. He also learned the bartender at the tavern had corroborated that Rocky was outside the tavern at 2:00 a.m.

After ten minutes, Williams returned to the library and resumed questioning Rocky. The second phase of questioning lasted from thirty to forty minutes. Serbousek and Porter were also present. Again, no one advised Rocky about his *Miranda* rights, nor attempted to communicate with his parents to obtain the written consent to question further.

During this period of questioning, Williams confronted Rocky with the officers' knowledge that he owned a knife. Rocky admitted this and complied with Williams' request to describe the knife and the length of the blade. Williams also confronted Rocky about being seen outside the tavern at 2:00 a.m. on Saturday and spending a twenty dollar bill in the tavern on Saturday afternoon. Rocky also admitted this.

Williams then questioned Rocky about his references to a fight with a Winfield boy near the post office. Rocky changed the story to suggest his fight was with someone near a truck outside the tavern. Williams then told Rocky he did not believe the story about a youngster from Winfield, pressed Rocky for more details about his contact with the victim, and said, "Rocky, I think there is more you can be telling us about this man."

Rocky then admitted he had seen the victim leaving the tavern. He said the victim was coughing, and when he inquired what was wrong, the victim told him he had asthma, coughed some more and, as he walked away, called Rocky a name. After relating this, Rocky became emotionally upset and was close to tears. At this point Williams asked, "Is that about when it happened?" Rocky replied that it was.

Williams left the library, returned downstairs, and told the others that Rocky's parents should be notified. According to Williams' testimony it was only at this point that he believed Rocky had become a "suspect" and that any further questioning would amount to more than a mere "interview." Another officer told Williams Rocky's father might not allow further questioning. The opinion was based on an experience from a previous, unrelated investigation, when Rocky's father refused to allow Rocky to be questioned.

Serbousek and Porter remained in the library and explained to Rocky his status and rights as a suspect. He was then advised of his *Miranda* rights in detail.

Minutes later Rocky's parents arrived. Williams told them that Rocky was thought to be involved in the homicide and that the officers wanted to continue visiting with Rocky about it.

Rocky's father was somewhat acquainted with Serbousek and trusted him. He did not know Williams and required that Serbousek vouch for his trustworthiness before agreeing to any further questioning. The officers, though first stating they could not make any promises about the outcome of the interview, said they would "do what we could" for Rocky. Rocky and his parents were upset but, with the officers' assurances, did agree to the interview.

Rocky and his parents both signed an acknowledgment and waiver of *Miranda* rights form. Only five minutes elapsed between the entrance of Rocky's parents into the library and the signing of the waivers. The questioning of Rocky resumed immediately. Williams questioned Rocky from 9:30 until about 10:15, when a court reporter arrived. A fifteen minute break was taken while she set up her equipment. During this break Williams told the reporter not to place Rocky under oath for fear it would upset him more. Williams then resumed questioning and finished sometime between 11:00 and 11:30. By the end of the questioning Rocky had given a complete and inculpatory statement, detailing his involvement in the killing. He was then arrested and incarcerated.

After considering the totality of the circumstances, the juvenile court granted Rocky's motion to suppress. It concluded that any statement made by Rocky after the first hour of questioning must be suppressed, and gave two reasons for the ruling:

(1) Rocky should have been advised of his *Miranda* rights after the first hour because the subsequent interrogation was initiated after he had been taken into custody or otherwise deprived of his freedom of action in a significant way.

(2) Williams' statement that he would do what he could to help Rocky amounted to "promissory leniency" because it was calculated to encourage and induce Rocky's father to consent to the interrogation of his son.

■ I. Although the trial court apparently relied on constitutional grounds for its ruling we think the questions in large part can be determined on the basis of statute. We recognize a duty to avoid constitutional questions when the merits of a case may be fairly decided without facing them. *See State v. Davis*, 269 N.W.2d 434, 439 (Iowa 1978).

Iowa Code section 232.11(1)(a) (1981) provides that children "shall have a right to be represented by counsel" from the time they are "taken into custody" for any questioning concerning an alleged delinquent act that constitutes a serious or aggravated misdemeanor or felony. Under Iowa Code section 232.11(2) this right cannot be waived by a child without the written consent of the child's parent, guardian, or custodian.

It is argued that violation of the consent requirements should not result in a *per se* exclusion of the statements in a juvenile proceeding. Section 232.45(9) expressly provides a *per se* exclusion of such statements in a *criminal* proceeding (following a juvenile court's waiver of jurisdiction). But there is no similar express provision for juvenile proceedings. Section 232.47(6) appears to provide that failure to adhere to the requirements of section 232.11(1) and (2) is only one factor to be considered by a juvenile court in determining whether to admit such statements in an adjudicatory hearing.

Nevertheless, in *State v. Aldape*, 307 N.W.2d 32, 35 (Iowa 1981), we indicated that a statement obtained from a child without a valid waiver under section 232.-11(2) is *per se* inadmissible. We think the statement in *Aldape* accurately reflects the legislature's intent.

■ It would be incongruous for the legislature to impose a *per se* exclusionary

rule in criminal cases but not in juvenile cases. The State's interpretation of section 232.47(6) would diminish the clear requirement of section 232.11(1) and (2): that a child "in custody" *shall* have the right to counsel unless the right is properly waived by both the parent and child. We cannot believe the legislature intended that police be allowed to ignore this requirement by relying on other circumstances listed in section 232.47(6) to mitigate the absence of counsel or parental consent. We hold that the *per se* exclusion necessarily applies to juvenile proceedings as well as to criminal ones.

II. Under section 232.11 Rocky's statements, taken in the absence of counsel and without his parents' consent, are inadmissible if he was "in custody." Although the State argues otherwise, we think he was. We think the term "in custody" means the same thing under chapter 232 as it does in constitutional challenges. In *State v. Cook*, 330 N.W.2d 306, 311 (Iowa 1983), we quoted the *Miranda* definition:

> By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.

■ It is disputed whether the *Miranda* definition of "in custody" was significantly altered in *California v. Beheler*, —— U.S. ——, ——, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275, 1279 (1983) (" 'restraint on freedom of movement' of the degree associated with a formal arrest"). We need not and do not resolve the dispute. Under the totality of the circumstances, Rocky was "in custody" under either view. A number of factors make up this totality. Numerous officers were present. Many of them were armed. The interrogation lasted several hours and included extensive confrontational questioning. The officers were highly suspicious of Rocky. Responses to Rocky's statements about attending the football game indicated he could not attend. Porter was sent to the library to ensure that Rocky did not leave. Rocky's age and visible emotional state diminished his ability to assert himself. Rocky was never told he was free to leave, and, when all the circumstances are weighed, it is clear he was not.

We conclude that Rocky's statements during the second phase of his interrogation were properly suppressed.

III. Rocky contends, and the juvenile court found, that his statements and confession, given after his parents arrived, should be suppressed. This is because his parents' consent was induced by promissory leniency. Although a finding of involuntariness on such a basis usually involves a defendant's own waiver, the consent should be no less knowing and voluntary because it is given by a parent on behalf of a child. The legislature has demanded that painstaking care must be taken to obtain parental consent before questioning a juvenile. The child can be expected to rely on the judgment of the consenting parent. The rationale of improper inducement is the same and should apply here.

■ We explained the rule in *State v. Hodges*, 326 N.W.2d 345, 348 (Iowa 1982):

> The question of voluntariness is a matter of sorting out the impetus for the inculpatory statement. To be admissible the statement must freely emanate from the mind of the speaker. If the statement is not the product of "rational intellect and free-will," but results from a promise of help or leniency by a person in authority it is not considered voluntary and is not admissible. [Authorities.]

We often state the rule by quoting from *Bram v. United States*, 168 U.S. 532, 542–43, 18 S.Ct. 183, 187, 42 L.Ed. 568, 573 (1897):

> "[T]o be admissible [a confession] must be free and voluntary; that is, must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence." [Quoting authority.]

Under the special facts here, we think the consent of Rocky's parents failed this test. Again a number of factors, taken together, lead to the conclusion.

The consent here was hastily sought and given; only a few minutes elapsed between the time the parents were told of Rocky's involvement, and the time they were required to give or refuse consent. At that point Rocky's position appeared to them to be already hopelessly compromised by reason of his statements, given in violation of his statutory protections.

Rocky's father imposed special trust in one officer, whom he knew, and agreed to proceed with the other only after the first officer vouched for the second. It was against this background that the officers promised to "do what they could" for Rocky.

It is true, as the State argues, that the officers prefaced this promise of help with a disclaimer. They did say they gave no assurances about the outcome of the interview. But, under the circumstances, this disclaimer cannot rescue the improper promise to help. Against this factual background the promise to help seemed the only hope of a lifeline to Rocky.

The promise here differed from the one we considered in *State v. Whitsel*, 339 N.W.2d 149 (Iowa 1983). Whitsel was charged with kidnapping. We found his inculpatory statement was voluntary even though the officers told him they would recommend that he receive psychiatric help and that they would tell the prosecutor of his cooperation. We said:

> We do not consider either an offer to recommend psychiatric help or an offer to inform the prosecutor of defendant's cooperation to be tantamount to a promise of leniency. [Authority.]

*Id.* at 153. But this officer's promise here to do "what they could" for Rocky was more enticing. Rocky's parents could infer far more from this promise than a promise to recommend psychiatric help. They could be, and we think they were, misled into believing that the offer of help amounted to a pledge to intervene in Rocky's behalf when charges were brought against him.

The parental consent was involuntary and the juvenile court was correct in sup-

pressing Rocky's statements and the confession which followed.

AFFIRMED.